## J. J. MOSNAT, Appellant, v. F. E. SNYDER.

**Libel:** PER SE: *Attorneys.* A letter recited: "We are looking into the doing of this tribe of attorneys. It looks very much as though they put their heads together, and each of them get as much out of the estate as possible. An outside attorney told me a few days ago that M. had put a lien on the estate for $1,250 on account of the heirs you represent, and $500 extra to fight the church, making $1,750 for one and the same thing. Outrage!" *Held* to be libelous *per se.*

*Appeal from Benton District Court.*—HON. G. W. BURN-
HAM, Judge.

## TUESDAY, MAY 17, 1898.

AN action for libel. The basis of the action is a
letter written from Belle Plaine, Iowa, to Charles Kipp,
of Pennsylvania. It appears from the petition that
plaintiff is an attorney at law of some twenty years'
standing and that the letter was falsely and
maliciously published of and concerning him. The
objectionable part of the letter is as follows:

Belle Plaine, Ia., March 26, 1894.

"Charles Kipp—Dear Sir: Your favor of the 24th
at hand. Thanks for the same.

"We are looking into the doing of this tribe of
attorneys. It looks very much as though they put their
heads together, and each of them get as much out
of the estate as possible. An outside attorney told me
a few days ago that Mosnat had put a lien on the John
Zeller estate for $1,250 on account of the heirs you rep-
resent, and $500 extra to fight the church, making $1,750
for one and the same thing. Outrage!

"Besides this, that attorney says that, under the
law of Iowa, a foreign corporation (such as the Ev.
Church) could not inherit anything. If this is so, you
heirs ought to have gotten that $\frac{1}{4}$ of the estate that
the church got, in addition to what you did get. How
is this? Do you think Mosnat got for you all he could,
as he agrees in his contract, if that is correct. That
lawyer further says that there was no court fight over
the division at all; that the church lawyer, Mosnat, and
Mrs. Zeller's lawyer made a division, and the court
signed it. Now think of it. For this, Mosnat wants

$1,750; the church attorney, I think, $400.00; and Mrs. Zeller's attorney, $900.00,—$3,050.00. Then, the church attorney sells the church interest to Mosnat for $2,500, which I think is certainly worth $3,500 in my estimation, giving him another profit of about $1,000. *Whether this was part of the agreement or not, I do not know.* I understand, Mosnat bought out three of the old country heirs for about one-fifth what they have in it, and so it goes. I wonder whether there was not some misrepresentation to those Germany heirs? Could you not write them, and find out, and let me know? It seems a shame to have things go in this way. John Zeller and I were always good friends, and I dislike to see so much of his property go to outside parties. Please let me know by return mail whether young John Zeller and Mrs. Mary Rabe, his sister, gave you or Mosnat power of attorney. They don't seem to know. John thinks he did, but Mary says she did not. Whatever is done must be done now (April term of court); hence I urge you to answer immediately.

"If an attorney will undertake to reduce these exorbitant charges made by Mosnat, will you be willing to let him try it on per cent., the same as Mosnat made an agreement with you, or nothing, if he gets no reduction?

"I am going to try to buy out a few of the heirs, so I have a personal interest, and then I can help do something.

"As it now stands, the Mrs. John Zeller's heirs got all they could expect, hence there is no trouble on our side; but our share in that extra $500 Mosnat charges, the balance is all on your side of the question to explain about the per cent. spoken of on page 5. I mean like this: If he reduces it to $100, then he would get $25, and your heirs would make $75, with no danger of losing anything. Mosnat, so I am told, bought out two of the Germany heirs for $50 each.

"Excuse poor writing, as I am writing on a sick bed. Hoping to have you answer my questions by return mail, I am,

"Most respectfully yours,

"F. E. Snyder."

The petition seeks a recovery on the theory that the letter is libelous in itself, there being no claim of special damages or attempt to render the laguage actionable by innuendo. The answer is in six divisions, the first being a general denial, and the others admitting the writing of the letter, pleading the truth of the statements therein, matters in mitigation, and to show that the communication was privileged. It is made to appear in the answer that Kipp, to whom the letter was written, represented certain heirs of John M. Zeller, deceased, late of Benton county, Iowa, and that defendant was acting as administrator of the estate of Anna M. Zeller, deceased, late of said county, who survived said John M. Zeller as his widow; that both Kipp and defendant, in their representative capacities, were interested in the settlement of the estate of said John M. Zeller; that Kipp employed defendant as attorney to look after the interest of the heirs of said estate whom he represented; that he wrote the letter in suit in answer to a letter from said Kipp, making inquiries as to the settlement of said estate, in which he and said Kipp were mutually interested; and that he had reason to, and did, believe the statements in said letter to be true; and that the letter was written in good faith, without malice, and for the purpose of advising said Kipp as to the general condition of the estate. The cause proceeded to trial, to a jury; and, at the close of the evidence, the court, on motion of defendant, directed a verdict for him, and, from a judgment thereon, the plaintiff appealed.—*Reversed.*

*Tom H. Milner* and *J. J. Mosnat* for appellant.

*Gilchrist & Whipple, C. Nichols* and *C. W. E. Snyder* for appellee.

GRANGER, J.—I. We are first to consider the question, is the letter libelous *per se?* In considering this question, care must be taken to disregard facts, necessarily in mind from a reading of the record, that are foreign to the question. Our statutory definition of "libel," so far as it is applicable to this case, is as follows: "A libel is the malicious defamation of a person made public by any * * * writing * * * tending to provoke him to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefits of public confidence and social intercourse." Code 1873, section 4097. In *Hollenbeck v. Hall*, 103 Iowa, 214, we quoted, as defining the word "defamation" as follows: "Words which produce any perceptible injury to the reputation of another." "A false publication calculated to bring one in disrepute." To render the letter libelous, it must be defamatory, in the sense indicated, and tend to some of the consequences specified in the statute quoted. In determining this, we must take the scope and object of the whole letter, when read and considered together, and see to it that such meaning be given to the language as naturally belongs to it. *Military Academy v. Gaiser*, 125 Mo. 517 (28 S. W. Rep. 851); *Cooper v. Greeley*, 1 Denio, 358. Without any doubt, the letter speaks of the charges as *outrageous* and *exorbitant*. The word "outrage" is variously defined, and the particular definition to be applied should be the one indicated by considering the word in the connection in which it is used. It signifies a bold or wanton injury to person or property, wanton mischief,

gross injury, etc. Under all definitions, it is an aggravated wrong. Take, first, the following paragraph of the letter: "We are looking into the doings of this tribe of attorneys. It looks very much as though they put their heads together, and each of them get as much out of the estate as possible. An outside attorney told me a few days ago that Mosnat had put a lien on the John Zeller estate for $1,250 on account of the heirs you represent, and $500 extra to fight the church, making $1,750 for one and the same thing. "OUTRAGE!" Nothing in the letter can take from that language the meaning that the plaintiff and others, from appearances, were acting together to wrongfully take from the estate as much as possible. The statement is absolutely inconsistent with honest purposes, and must be so understood. The language of the paragraph, to us, admits of no other conclusion than that the plaintiff, in his professional capacity, had acted outrageously dishonest in taking from the estate. The other language of the letter intensifies, rather than weakens, such a conclusion, for it presents facts and figures from which the statement appears to be true, and they were evidently so intended. A quite conclusive test is this: If the statements fairly deducible from that letter are true, the plaintiff is not an honest man in his professional doings, and is not entitled to public confidence. No discreet business man, believing those statements, would intrust him with business of such a character. Such a publication, of course, brings one into disrepute, and produces a perceptible injury, if not true. To test the question of the letter being libelous on its face, we treat the statements as untrue. It is not to be questioned that the letter imputed to the plaintiff gross professional misconduct. In *Sharpe v. Larson*, 67 Minn. 482 (70 N. W. Rep. 1, 554), it is said: "Publication which imputes to one holding an office improper misconduct

therein, or to an attorney at law professional miscon-
duct, is libelous per se." The same rule is stated in
Odgers, Slander & Libel, 26. In *Military Academy v.
Gaiser, supra,* it is said: "Words which on the face of
them, when falsely published of a party, in connection
with his trade or profession, must necessarily injure
him with respect thereto, or which directly tend to the
prejudice of such person in his trade or business, are
actionable in themselves without proof of special dam-
ages." The proposition has abundant support on
authority. We think the letter libelous in itself.

II. It is thought that, notwithstanding the letter
is libelous in itself, it appears that it was a privileged
communication. The question is to be determined from
the evidence. On this question, each party is claiming
that the evidence is so without dispute that the law
settles it in his favor. We think neither conclusion is the
correct one. It is a question for the jury under proper
instructions. No instructions were given, and there is
no reason to apprehend but that the law will be prop-
erly stated by the court. We must not attempt a dis-
cussion of the evidence in view of a new trial.

III. It is urged that the record shows that the
statements in the letter are true, and hence that the
ruling of the court is sustained. We doubt the court's
being controlled by such a thought. While, in some
respects, what is said in the letter is shown to be true,
that cannot be said, as a matter of law, of what it
thought to be defamatory. We should not, and do not,
attempt any discussion of the evidence. We think the
cause should be submitted to a jury, so that it may settle
the facts as to the truth or falsity of the publication,
and, if true, let the plaintiff take the consequences as he
deserves them. If false, and defendant has no legal
excuse for his act in publishing it, he, too, should be
answerable for his misconduct in damages. The judg-
ment is REVERSED.