Argued October 25, 1929; reversed February 11, 1930

# REIMAN *v.* PACIFIC DEVELOPMENT SOCIETY ET AL.

(284 P. 575)

*Lamar Tooze* of Portland (Jaureguy & Tooze and G. A. Heikkila, all of Portland, on the brief) for appellant.

*G. C. Fulton* of Astoria (Enoch Mathison and A. C. Fulton, both of Astoria, on the brief) for respondents.

ROSSMAN, J. This is a civil action of libel. There are three defendants; one of them is alleged to be the publisher, another the printer, and the third the editor of a newspaper published at Astoria, in the Finnish language, entitled "The Toveri." The complaint avers that this publication has a large circulation in this state among the Finnish people of whom the plaintiff is one. He describes himself as having resided in this state "for many years" and as a "member of the Brotherhood lodge (Veljeysseura) at Astoria, Oregon, a Finnish fraternal organization." This article, as reproduced in the complaint, was entitled "Portland, Ore., Contents: Serious matters are discussed in serious tones," and first mentions a motion which the plaintiff had made at a previous meeting of the local Brotherhood lodge (Veljeysseura) suggesting that support be withdrawn from the Toveri and the action taken by the lodge thereon. Since it is not contended that this portion of the article defamed the plaintiff, we shall postpone quoting from it to the place he declares is defamatory. The following is the portion complained against:

"The foregoing should already be sufficient if the question involved only this thing. But it is necessary to add to this a regular agitation in this locality which

has been carried on for years by known former 'comrades' who are impossible in group enterprise and who have withdrawn from labor organizations. Into that bunch it seems Mr. Reiman fits. Besides Mr. Reiman has more former titles as a disorganizer than have these others—whose work has gone to waste the last weeks.

"But let us recall the time when the 'Double W's' (meaning the organization known as Industrial Workers of the World) started to tear down the Western Miners' Union in Butte. It was just Mr. Reiman who as a professional accuser went to the central states and to all other places where it was thought the Western Miners' Union had support to slander the union. And this slander brought results at last. Brought results for the reason that it was precisely what the mining capitalists desired. Then when that organization (meaning Western Miners' Union) was broken up, the union meeting hall by the aid of dynamite was destroyed then they (meaning the plaintiff and said Industrial Workers of the World) were satisfied, in other words, they (meaning plaintiff and Industrial Workers of the World) had time to hunt for new locations, and new fields of endeavor where they could carry on similar work of destruction.

"But here on the Pacific Coast we have no such trade unions into which promoters of this type could secure membership in numbers sufficient to do anything. Even the loggers a long time ago have lost all of that organization which once rose and was so promising on the battlefield.

"Hence they have left now for their spheres of activity only the Brotherhood lodges and congregations. But even in these active participation seems to bring about too many difficulties, because they still have their old by-laws, which can not be so easily repealed. So they have lately started to seek roundabout methods by which they could harm most effectively other workers' group organizations. Insofar as Finnish organizations are in question (we must recall that similar destructive work is done internationally)

their attacks center against the S. T. organization, local workers' organizations, and the Workers'-Communist party. Against the organs and the well-wishers of these organizations, in a word, against all honest workers organizations, they are waging a continuous war. And what kinds of procedure these destroyers attempt to put into operation! I as a workers' comrade honestly request every man and woman in Portland who belongs to the Brotherhood lodge to give attention to my remarks now since it is not yet too late! Workers-Comrades!''

The writer then discusses the ''many choirs, orchestras, dramatic clubs, and young people's clubs,'' which he declares ''have been so fervently boosted'' lately and leaves the inference that the activity in behalf of these is intended to destroy the present Finnish organizations. This portion of the article makes no mention whatever of the plaintiff, but possibly leaves the impression that the support given to these new organizations has been prompted by a desire to destroy the existing societies. The article does not recite that any improper methods have been employed in the support of these new organizations. The complaint alleges no special damages but seeks recovery of $15,000 general damages. The defendant demurred to it on the ground that it did not state facts sufficient to constitute a cause of action; the demurrer was sustained and from the resulting judgment the plaintiff has appealed.

He frankly concedes:

''Since no special damages are alleged by the plaintiff, it may be conceded at the outset that plaintiff's right to recover general damages (and therefore the sufficiency of his complaint) depends upon whether the article is such that the court may say as a matter of law that it is libelous per se, or more accurately, that it is actionable per se.''

He contends that the article

"* * * naturally and obviously imputes to the plaintiff the following: (1) That plaintiff is an agitator who is trying to disrupt the Brotherhood lodge, the S. T. organization, local workers' organization and the workers' communist party; (2) that plaintiff went to the Central states to slander the Western Miners' Union; (3) that plaintiff associated himself with the Industrial Workers of the World in breaking up the Western Miners' Union; (4) that the alleged slander by plaintiff of the Western Miners' Union caused the Western Miners' Union to be broken up and their meeting hall to be destroyed by dynamite; (5) that plaintiff and the Industrial Workers of the World after breaking up the Western Miners' Union and dynamiting their meeting hall were satisfied and 'had time to hunt for new locations and new fields of endeavor where they could carry on similar work of destruction.'

"Plaintiff asserts that the foregoing charges impute to the plaintiff the commission of the crime of criminal syndicalism and sabotage as that crime is defined by section 2025-1, Oregon Laws."

 Much space is consumed in the briefs in a discussion of this court's recent decision in *Ruble v. Kirkwood*, 125 Or. 316 (266 P. 252). The plaintiff seems to be alarmed lest that decision is a holding that we have merged the two actions of slander and of libel into one, and have determined to govern the union of the two by the principles applicable to the action of slander. It seems desirable, therefore, at the outset to take notice of the fact that, in the absence of any special damage, an action for libel affords redress for some of the injurious consequences of defamatory words not recognized by an action of slander. Of course, an action for libel must be predicated upon "written" words, which includes any printed, painted or other nontransient method of conveying a thought.

*Willetts v. Scudder,* 72 Or. 535 (144 P. 87); the action of slander dispenses with the necessity for the "writing." But the more important difference between the two actions consists of the fact that libel undertakes to grant redress for all of the injurious consequences inflicted by the defamatory words, whereas one defamed by another's oral communications can secure redress, in the absence of special injury, only in the event the injury can be pigeon-holed into certain well defined classifications recognized by the action of slander. From Odgers on Libel and Slander (6th Ed.), p. 2, we quote: "If the words, being written and published or printed and published, disparage the plaintiff or tend to bring him into ridicule and contempt"; they constitute the foundation for an action of libel, but if the words are spoken, and occasion no special damage, they constitute the foundation for an action of slander only in the event they fall within one of the following four classifications:

"* * * Words which impute a charge which, if true, will subject the party charged to an indictment for a crime involving moral turpitude, or subject him to an infamous punishment; (2) words falsely spoken of a person which impute that the party is infected with some contagious disease, where if the charge is true, it would exclude the party from society; (3) defamatory words, falsely spoken of a person, which impute to the party unfitness to perform the duties of an office or employment of profit, or the want of integrity in the discharge of the duties of such an office or employment; and (4) defamatory words, falsely spoken of a party which prejudice such party in his or her profession or trade." *Barnett v. Phelps,* 97 Or. 242 (191 P. 502, 11 A. L. R. 663).

The above distinction between the injurious consequences which the two actions seek to redress is well

recognized. III Columbia Law Review, 546; IV Columbia Law Review, 33; VII Oregon Law Review, 353; Hale, Law of the Press, p. 32; Newell, Slander and Libel (4th Ed.), sections 2 and 3; 36 C. J. Libel and Slander, sections 28 and 29; 17 R. C. L. Libel and Slander, section 3, and see *Axton Fisher Tobacco Co. v. Evening Post Co.*, 169 Ky. 64 (183 S. W. 269, Ann. Cas. 1918B 560, L. R. A. 1916E 667). The reasons for the distinction have been variously stated; Mr. Van Vechten Veeder in the above articles in the Columbia Law Review develops the historical reason, while Mr. Odgers in the text previously cited believes that the difference in effect produced by the two methods of communication demands a different treatment in the causes of action. However, it is enough for our purposes to notice that if a complaint alleging oral defamation, does not aver special damage it can bring the plaintiff no relief unless it discloses a situation within one of the four above classifications; but that in an action for libel the complaint is sufficient if the alleged defamatory words bring the plaintiff into the public hatred, contempt or ridicule. The language of Mr. Justice BELT in *Ruble v. Kirkwood*, 125 Or. 316 (266 P. 252), possibly does not fully recognize the above distinction; see the comment by Dean Carpenter in VII, Or. Law Review, 353. Any implication suggested by *Ruble v. Kirkwood* that in this state libel and slander are merged, and that the rules governing the latter now govern the union of the two, must be considered as overruled. The result reached in *Ruble v. Kirkwood* has not been criticized, although some of the reasoning employed in it has left inferences which we seek to correct in our efforts to determine whether the complaint before us, which alleges no special damages, states a cause of action.

██ Since this is an action of libel, the plaintiff has stated a cause of action if the article previously

mentioned subjects him to public hatred, contempt or ridicule. And the use of the word "public" does not imply that every person must share in the hostile feeling; it is enough if the publication "obviously would hurt the plaintiff in the estimation of an important and responsible part of the community." *Peck v. Tribune,* 214 U. S. 185 (53 L. Ed. 960, 29 S. Ct. 554, 16 Ann. Cas. 1075) ; see also Hale, Law of the Press, p. 32.

We come now to the question whether the words published by defendants, when taken in the sense in which they evidently were understood by those who read them, support his contention that he was defamed. In determining whether the article produced such a result the entire language must be looked to, and the meaning should be given to it which is the most natural and obvious. *Peck v. Coos Bay Times Pub. Co.,* 122 Or. 408 (259 P. 307). In other words, we should place ourselves in the position of the defendants' subscribers.

An examination of the article before us readily reveals that it contains much looseness of expression. It begins with a discussion of a motion made by the plaintiff before the Brotherhood lodge, and then takes notice of "a regular agitation in this locality which has been carried on for years by known former 'Comrades' who are impossible in group enterprise." The writer classifies the plaintiff in "that bunch," and proceeds to mention what he did "when the 'Double W's' started to tear down the Western Miners' Union in Butte." The activity attributed to the plaintiff was that at that time "as a professional accuser" he "went to the central states * * * to slander the union." The article states that the slander brought results "for the reason that it was precisely what the mining capitalists desired." This is followed by a recital that

when the union ceased to exist its hall was destroyed by the use of dynamite and that "then they were satisfied, in other words they had time to hunt. for new locations, and new fields of endeavor where they could carry on similar work of destruction." The article recites that upon the happening of these events there was left on the Pacific Coast "no such trade unions into which promoters of this type could secure membership in numbers sufficient to do anything" and that as a consequence "their attacks center against the S. T. organization, local Workers' organization, and the Workers'-Communist party." Having made these observations the writer proceeds to discuss the subject-matter with which he is primarily concerned: the welfare of the Brotherhood lodge and the Workers' organization. He evidently felt that these organizations were endangered by the development of choirs, orchestras and dramatic clubs; the article leaves the impression that the plaintiff and his co-agitators are promoting these activities for the purpose of disrupting the older organizations in which the writer is especially interested.

Believing that we have sufficiently reviewed the challenged publication, we shall quote no further from its contents, but proceed to state our conclusions. We do not believe that anything contained in the article would lead any one to believe that the plaintiff held a membership in the Industrial Workers of the World, or joined with it in the furtherance of any of its programs. It is true that the writer states, that when that organization created a situation unfavorable to the Western Miners' Union, the plaintiff took advantage of it by slandering the union; but this statement does not justify a conclusion that the plaintiff was a member of the Industrial Workers of the World. Like-

wise, we fail to find in the article any support for the claim that it charges the plaintiff with the crime of sabotage, or with the destruction of the Union's hall. We are convinced, however, that it accuses the plaintiff of being an irrepressible agitator, who upon one occasion, at least, resorted to slander to gain his end. Publications, which accuse a person of being a slanderer, a libeler, or a deceitful person, are generally regarded as sufficient to sustain actions of this character. 36 C. J. Libel and Slander, p. 1172, section 48; 17 R. C. L., Libel and Slander, p. 291; *Upton v. Hume,* 24 Or. 420 (33 P. 810, 41 Am. St. Rep. 863, 21 L. R. A. 493); *Over v. Hildebrand,* 92 Ind. 19; *Brooks v. Silverlock,* 12 Q. B. 624 (17 L. J. Q. B. 306); and *Jenkins v. Taylor,* (Tex.) 4 S. W. (2d) 656. To accuse another of having slandered a union to the advantage of the mine owners, we believe, attributes to him a baseness of character which will result to his disadvantage. Neither employer nor employee has respect for such an individual. An accusation that one is a slanderer imputes dishonorable conduct—imputes both bad action and base principle. In fact it attributes to him such lack of moral principle as enables him to go about spreading false, vicious reports. It requires no argument to make it apparent that such an accusation subjects its victim to public contempt and ridicule.

Since, in our opinion the article contains the defamatory matter, which we have indicated, it follows that the complaint alleges a cause of action, and that the circuit court erred when it entered a judgment dismissing the complaint. The judgment must be reversed and the cause remanded.

BELT, J., McBRIDE and RAND, JJ., concur.

COSHOW, C. J., BEAN, J., and HAMILTON, A. A. J., dissent.