JAMES E. CASSIDY, Plaintiff, *v.* GANNETT COMPANY, INC., Defendant.

Supreme Court, Monroe County, March 27, 1940.

*Chamberlain, Page & D'Amanda,* for the plaintiff.

*Goodwin, Nixon, Hargrave, Middleton & Devans,* for the defendant.

VAN VOORHIS, J.   The defendant's motion to dismiss the action upon the pleadings depends upon whether a newspaper article appearing in a column entitled " The Washington Merry-Go-Round " is libelous *per se.*   It states:

### " GHOST REPORTS.

" Members of the TVA investigating committee are secretly probing an inside tip that the two minority reports panning the management of the great power project are the work of a pair of utility ghost writers.

" They are Paul O. Peters, reported to have written the official blast signed by Senator James Davis of Pennsylvania and Rep. Charles A. Wolverton of New Jersey, and Col. James E. Cassidy, credited with authorship of the hostile report turned in by Rep. Tom Jenkins of Ohio.

" Throughout the extended inquiry, Wolverton and Jenkins displayed open bias against TVA, frequently clashing with other committee members.   Both Peters and Cassidy are known to have spent considerable time in the offices of Wolverton and Jenkins when the minority reports were being written.

" Peters, who worked for the Republican Congressional Committee during the 1938 campaign, has a long record of anti-TVA activity.   He wrote a book and numerous articles assailing TVA, has previously supplied congressional critics with material for hostile speeches.   Capitol Hill friends credit him with the boast that he had the keys to six senatorial and congressional offices.

" Cassidy is a World War army engineer who once tried to get a job with TVA but was turned down by Dr. Arthur Morgan, ousted chairman, because ' * * * we did not know who his real employer was,' Morgan gave this explanation to a House committee during an investigation of a leak on a secret General Accounting Office report on the TVA.

" Acting as the representative of Congressman Andrew May, Kentucky member of the committee, Cassidy had obtained a copy of the report and used a mimeograph machine in the office of the Commonwealth & Southern Power Co., a bitter TVA foe, to print a press release of denunciatory extracts.

" Cassidy hotly denied that he had received utility pay for the job, but as a result an amendment was passed by Congress requiring the Accounting Office to submit all TVA audits to the TVA before making them public."

The defamatory nature of these words does not consist in calling plaintiff a ghost writer, nor utility engineer, nor even in suggesting that he was in the pay of a utility company while he wrote Congressman Jenkins' report if he disclosed that fact and Congressman Jenkins in good faith indorsed his views. Members of Congress may properly inform themselves on the state of the nation from whatever sources they deem best suited to that purpose, and have the right to advocate and to oppose programs as they believe the interests of the nation or their constituents warrant regardless of whether these be in agreement or at variance with private property interests affected. Utility men may try to convince Members of Congress that the country is best served by private enterprise, and no loss of character results if Congressmen adopt their ideas. A utility engineer is degraded, however, if he insinuates himself into the service of responsible public officers for private ends by concealing his real interest, if that is or may be antagonistic to the purposes of the government. It is inconsistent with the respect owing to the office of Congressman to allow it to be used as a sounding-board for utility propaganda as a result of intrigue by secret agents under the guise of furnishing disinterested technical advice, and the character of any person engaging in such conduct is condemned by a proper sense of public morality and decency.

The most serious effect of this article lies in the use which is made of the remark attributed to Chairman Arthur Morgan of the Tennessee Valley Authority that plaintiff once tried to get a job with that organization but was turned down because " we did not know who his real employer was." Read in connection with the statement that plaintiff is a utility engineer, and the reference to his relations with the Commonwealth & Southern Power Company, characterized as a bitter TVA foe, the repetition of Dr. Morgan's remark may reasonably be construed to mean: (1) Cassidy applied for employment as engineer with the TVA and was rejected; (2) the reason for his rejection was the fact that he owed primary allegiance to a private utility company which was, and would continue to be, his real employer, and whose interests were hostile to TVA; (3) this double allegiance rendered him unfit for public service in TVA; (4) he would not have sought employment in TVA unless his purpose had been to use it to promote the interests of his real employer, which would have been contrary to good public morals and at the expense of the United States; (5) notwithstanding that his private utility connection was sufficient to disqualify him, Cassidy kept it secret, as is shown by the fact that the TVA directors would have known otherwise who his real employer was. The implication is substantial that Cassidy did not lay his cards upon the

table, and that, except for the shrewdness of its directors, the TVA would have been imposed upon; (6) Cassidy's subsequent conduct involving Congressmen Jenkins and May was cut out of the same cloth and is to be judged by the same standards.

The immediate subject of the article is the criticism of TVA contained in the two minority reports submitted by members of the congressional investigating committee. These reports are interpreted by attacking the motives of the persons declared to have written them and by representing as dupes the Congressmen who signed them. Only the report ascribed to Cassidy's authorship is here involved. The reason for introducing Cassidy's previous record into the newspaper article is evidently to explain his relations with Congressman Tom Jenkins of Ohio, whose report he is said to have written. The incident referred to in Dr. Morgan's remark, which has been analyzed above, is presented as part of Cassidy's previous record. It is important to examine what the article says about the occasion for Morgan's remark and about his object in making it. Before Congressman Jenkins' report was written there appears to have been some inter-office communication within the executive branch of the government, described as a " secret General Accounting Office report on the TVA," which unexpectedly became public. Inasmuch as it was supposed to have been confidential and its release to the press was unexplained, this " leak " became the subject of investigation by a committee in Congress. Cassidy, it is written, proved to have been responsible. Dr. Morgan is reported to have given information to that committee which is where he is said to have made the statement that has been quoted about Cassidy. The article puts forth that Cassidy's attempt to obtain employment with TVA and his rejection for the reason mentioned by Morgan explains his motives and behavior in bringing about the leak, which could scarcely have been the case unless the leak resulted from underground activity by Cassidy to further the designs that had impelled him to seek employment in the TVA. It is stated that he obtained a copy of the General Accounting Office report by acting " as the representative of Congressman Andrew May, Kentucky member of the committee." The implication is that he obtained the report by the same devious methods that he had practiced unsuccessfully on Chairman Morgan when his career with the TVA was intercepted. It may be gathered that all this was past history and was resurrected by the news commentator to use in presenting a similar explanation of Cassidy's conduct in prevailing upon Congressman Jenkins of Ohio to permit him to write his minority report. It is insinuated broadly that Cassidy again concealed who his real

employer was. Did Congressman Tom Jenkins know that he was a tool of the utility interests? Was he overreached as Congressman May had been? It is recited that Cassidy hotly denied that he received utility pay for the latter job, which tends to confirm that he hid the connection the existence of which Morgan said prevented his employment by the TVA. Were Jenkins and May as keen as Morgan had been in detecting the man's duplicity? Inquiries such as these are suggested, and also the answers. That Congress is said to have found it necessary to make a law requiring the Accounting Office to submit all TVA audits to the TVA before making them public as a result of plaintiff's action does not charge the commission of a crime, but aggravates the seriousness of part of what he is said to have done by explaining that it was sufficiently detrimental to the United States to make it a statutory offense in the future.

Whether this construction shall be placed upon the article is a question for a jury (*Hoeppner* v. *Dunkirk Printing Co.*, 254 N. Y. 95, 105; *First National Bank* v. *Winters*, 225 id. 47, 50; *Morrison* v. *Smith*, 177 id. 366, 369; *Moore* v. *Francis*, 121 id. 199, 202, 203), which may find the innuendoes embodying it that are alleged in the complaint to have been sustained. There is a basis in the article for such a construction. The casual reader might not stop to analyze, but could easily conclude that plaintiff is a crook and let it go at that.

If this was fair comment upon facts truly stated on matters of public interest and concern, that is at most a defense (*Foley* v. *Press Pub. Co.*, 226 App. Div. 535) and not to be regarded upon a motion to dismiss a complaint which charges that the facts are stated falsely and with malice. (*Hoeppner* v. *Dunkirk Printing Co.*, 254 N. Y. 95, 105.) Privilege is also a defense unless the complaint establishes on its face that the privilege is absolute. (*Tierney* v. *Ruppert*, 150 App. Div. 863, 866, 867; *Chapman* v. *Dick*, 197 id. 551, 554; *Corwin* v. *Berkwitz*, 190 id. 952.) Here the article says that Dr. Morgan's statement was addressed to a congressional committee, but the complaint contains no averment to that effect, nor is it alleged that the quotation attributed to him is a correct report of what he said. Pleading the offending article does not establish its truth where the complaint alleges it to be false. (*Milliken* v. *Western Union Tel. Co.*, 110 N. Y. 403; *Hatch* v. *Mathews*, 83 Hun, 349.) Furthermore, a privilege surrounding the original utterance of Morgan's words would not protect against an extension of them to characterize acts by Cassidy upon other occasions in his relations with other persons. If the defendant has tarred him again with the same brush that Morgan used, Morgan's privilege

will scarcely be held to have accompanied the brush when it changed hands and was used to blacken other conduct than that to which it originally was applied.

The scope and object of the whole article is to be considered, and such construction put upon its language as would naturally be given to it by the reading public acquainted with the parties and the subject-matter. (*Sydney* v. *MacFadden Newspaper Pub. Co.*, 242 N. Y. 208, 214; *Turrill* v. *Dolloway*, 17 Wend. 426; revd. on other grounds, *Dolloway* v. *Turrill*, 26 id. 383.) It is immaterial that the article refers to the defamatory matter as being rumored, subject to investigation, or the like. (*Skinner* v. *Powers*, 1 Wend. 451.) " The publisher of a libel cannot escape liability by veiling a calumny under artful or ambiguous phrases, or by indirectly charging that which would be slanderous, if imputed in direct and undisguised language." (*Sanderson* v. *Caldwell*, 45 N. Y. 398, 401.) " Judges and jurors now read the words in court, as they would read them elsewhere; they no longer resort to those constructions which make that language innocent in the halls of justice, which was full of calumny when spoken or published out of door." (*Turrill* v. *Dolloway, supra.*)

The motion to dismiss the complaint is denied.

The defense of justification as pleaded in the answer is assailed by plaintiff upon his counter-motion for judgment on the pleadings upon the ground that it is narrower than the charges made in the article. (*Adell* v. *Cornwall Ind. Corp.*, 241 N. Y. 327.) The admission by the defendant of the incorrectness of the statement that the plaintiff used a mimeograph machine in the office of the Commonwealth & Southern Power Company is not enough to vitiate the defense since it does not affect the substance of the defamatory charges. (*Cafferty* v *Southern Tier Pub. Co.*, 226 N. Y. 87; *Fleckenstein* v. *Friedman*, 266 id. 19.) A more serious question arises from the failure of the answer specifically to state that Cassidy was in the employment of a private utility corporation, for which he sought to gain advantage while concealing that fact from the TVA directors and from Congressmen Jenkins and May. These are the damaging insinuations which may be drawn from the article. The answer is sufficient without the defense of justification, however, inasmuch as the libelous innuendoes are denied. The jury may place an innocent construction upon the article, in which event no justification is necessary. (*Foley* v. *Press Pub. Co.*, 226 App. Div. 535; *McDonald* v. *Press Pub. Co.*, 174 id. 463; *Hollingsworth* v. *Spectator Co.* [*No. 1*], 53 id. 291.) The plaintiff is not entitled to judgment upon the pleadings, even apart from the necessity of assessing the damages.

It remains to consider to what extent defendant should be required to comply with plaintiff's demand for a bill of particulars. Justification, fair comment upon public persons and events, and privilege are affirmative defenses; bills of particulars thereof are provided for upon the same principles applicable to defenses in other types of action. (*Ball* v. *Evening Post Pub. Co.*, 38 Hun, 11; appeal dismissed, 101 N. Y. 641; *Knipe* v. *Brooklyn Daily Eagle*, 101 App. Div. 43; *Burnham* v. *Wells*, 50 id. 175.) It is unnecessary to decide whether the answer is defective in pleading justification, or whether there is sufficient allegation of the truth of the facts stated to support the defense of fair comment. Defendant cannot be heard to say that these defenses are inadequate and, having pleaded them, must furnish requisite particulars. Since there is nothing libelous in the mere imputation that plaintiff acted as ghost writer for Congressman Jenkins, no particulars are allowed of the names of the members of the congressional committee investigating a tip that he did so, or of the exact nature of the tip, or of the names of the persons who credited him with having been the author of Jenkins' report. The time, place and means in accordance with which it is claimed that Cassidy tried to get a job with TVA should be stated as well as the time and place it is claimed that Dr. Morgan made the remark that has been quoted to a congressional investigating committee, together with the name of the committee, whether the statement was oral or written, and, if written, reference to any document or record in which it is claimed to have been expressed. Plaintiff is entitled to particulars of the time, place and manner in which it is claimed that plaintiff obtained a TVA report as representative of Congressman Andrew May of Kentucky, and reference should be given to the bill which it is claimed was passed by Congress as a consequence of plaintiff's acts requiring the TVA General Auditing Office to submit all TVA audits to the TVA before making them public. None of the other demands are warranted. The demand calling for a statement of what portion of the article is claimed to have been privileged refers to relief which, if proper, should be supplied by a motion to make the pleading more definite and certain. Except as hereinbefore allowed, plaintiff's demand for a bill of particulars is vacated.

Settle orders upon notice.