Yak Voorhis, J. (dissenting).
In our view the news article contained in the complaint is defamatory as matter of law, or, at the least, could be found to be defamatory by a jury. It concerns the disappearance of a man named Ivan Jerome who is a fugitive from justice, having forfeited his bail instead of appearing to stand trial for certain widely publicized sex offenses. The natural meaning of this article is, as we read it, that plaintiff is charged with having helped Jerome to escape. That is the inference which would normally be drawn from this news item by the average person. After stating that Jerome had been living for about six weeks in a hotel in New York City under an assumed name, the article continues:
‘‘ Last Thursday a clerk saw a strange man help Jerome carrying his luggage out of the Hotel. The stranger was identified by police as John D. Tracy, a former New York City policeman who had been hired *139 by Bockmore' as an investigator to aid in Jerome’s case.
“ ‘ Are you planning to check out? ’ police quoted the clerk as asking Jerome.
“ ‘ I might be called away, ’ Jerome was said to have replied, and left a small package with the clerk. Nassau detectives who examined it yesterday said it contained only a few shirts and other articles of clothing.
“ Police were unable to learn where Jerome and Tracy took the luggage. But the next day, Jerome, Bock-more, and Tracy showed up at Murray’s New York office at 3 PM for a conference on the upcoming trial. Murray said he had been in daily phone contact with Jerome. * * *
“ After the meeting with Murray, police learned, Bock-more and Jerome parted company with Tracy and left for Bockmore’s New York office. Bockmore believes he was the last person to see Jerome * * *.
“The last person to hear from Jerome before he vanished was Tracy. He said Jerome phoned him Friday evening to cancel an appointment they had made to go to court together Monday. Jerome explained he had made other arrangements.”
The majority of the court regard these words, we think, in so restricted and literal a sense as to lose sight of the meaning which the author conveys to the man in the street. Such construction is to be put upon its language as would naturally be given to it by the reading public acquainted with the parties and the subject matter (Sydney v. MacFadden Newspaper Pub. Co., 242 N. Y. 208-214). “Judges and jurors now read the words in court, as they would read them elsewhere; they no longer resort to those constructions which make that language innocent in the halls of justice, which was full of calumny when spoken or published out of door.” (Turrill v. Dolloway, 17 Wend. 426, 428, revd. on other grounds sub nom. Dolloway v. Turrill, 26 Wend. 383.)
“ The publisher of a libel cannot escape liability by veiling a calumny under artful or ambiguous phrases, or by indirectly charging that which would be slanderous, if imputed in direct *140 and undisguised language.” (Sanderson v. Caldwell, 45 N. Y. 398, 401.)
The newsworthiness of this account did not consist in whether Jerome carried his own luggage or whether someone else carried it for him. The public was not interested in whether he tipped a bellboy to carry his bags out of the hotel, or in who the bellboy was if he did. But if mention of these trifling circumstances might be used to reveal who helped Jerome get out of the clutches of the law, and to disclose that it was a former New York City policeman who had been hired as an investigator to aid in Jerome’s case, that was news. It would have been news whether it were reported that plaintiff carried Jerome’s luggage, or drove his automobile, or did anything else connected with Jerome’s departure symbolizing that he helped Jerome to jump bail. In modern journalese carrying Jerome’s luggage out of the hotel is just a combination of words to symbolize aiding in his escape. Words are symbols at most. Unquestionably it would have been libelous to have said that plaintiff co-operated with Jerome in enabling him to elude criminal prosecution. If a newswriter can invent another phrase which means the same thing in the context in which it is used, we fail to understand on what principle it ceases to be defamatory. If this language did not mean that, the article was not worth publishing. Nobody cared who carried Jerome’s luggage if that is all that was being discussed. When the hotel clerk asked if Jerome was checking out, he replied that he might be called away. So the reader is told, in effect, that plaintiff knew that Jerome was planning not to return.
The next highlight in the article is that ‘ ‘ Police were unable to learn where Jerome and Tracy took the luggage.” This expressed that the disappearance of the luggage became a matter of concern to the police, and implied that plaintiff helped Jerome to hide it where the police could not trace it. The police would not have been interested, the reader is led to assume, unless there was something sinister about the concealment of Jerome’s equipment for traveling. The reason why the police were interested is not far to seek. It is, as anyone reading the article is readily informed, that the mystery of Jerome’s disappearance is involved in the disappearance of his luggage. The reader is told that plaintiff helped to create *141 this mystery which baffled the police. A relationship was indicated between this and the circumstance that “ The last person to hear from Jerome before he vanished was Tracy.” The result might be different if this were an objective account of the circumstantial evidence in a criminal case, leaving the conclusion to the reader to draw who the culprit might have been. That is not what this article purports to be. The few ■ trivial circumstances that are enumerated furnish no basis for an independent analysis of what occurred, but are used as a vehicle to convey the writer’s thinly veiled conclusion that plaintiff is the guilty man who effectively helped Jerome to get away.
A charge that plaintiff had assisted the defendant in a sensational criminal case to break the law by jumping bail would have been serious enough, even if plaintiff had not been described as a former New York City policeman. Unless plaintiff conspired to do this, which, for present purposes, we must assume he did not, the article was a libel against plaintiff, couched in language which the reading public could not fail to understand. It is a literary technique by which the writer “without sneering” aims to “teach the rest to sneer” as Alexander Pope knew and said.
Even if this news item be not libelous as matter of law, as we think it was, it at least contains a basis for the innuendoes pleaded in the complaint, and under circumstances such that its construction is a question for a jury (Mencher v. Chesley, 297 N. Y. 94; Katapodis v. Brooklyn Spectator, 287 N. Y. 17; Hoeppner v. Dunkirk Print. Co., 254 N. Y. 95, 105; First Nat. Bank v. Winters, 225 N. Y. 47, 50; Morrison v. Smith, 177 N. Y. 366, 369; Moore v. Francis, 121 N. Y. 199, 202-203; Cassidy v. Gannett Co., 173 Misc. 634).
The order of the unanimous Appellate Division should be affirmed, with costs.
Judges Dye, Ftjld and Froessel concur with Judge Burke ; Judge Van Voorhis dissents in an opinion in which Chief Judge Conway and Judge Desmond concur.
Order of Appellate Division reversed and judgment of Special Term reinstated, with costs in this court and in the Appellate Division. Question certified answered in the negative.