Argued June 4, affirmed October 21, 1964

# FOWLER *v.* STRADLEY ET AL

395 P. 2d 867

*Richard D. Curtis,* Eugene, argued the cause and submitted the brief for appellant.

*Hale G. Thompson,* Eugene, argued the cause for respondents. On the brief were Thompson, Mumford & Woodrich, Eugene.

Before McAllister, Chief Justice, and Rossman, Sloan, Goodwin and Lusk, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff, Thelma Chapman Fowler, from a judgment which the circuit court entered in favor of the defendants, Willard O. Stradley and Dale W. Morris, after it had sustained their motion for a judgment of involuntary nonsuit. The action which terminated in that manner charged the defendants with the defamation of the plaintiff who is an attorney in good standing practicing her profession in Eugene. The defendants constitute a partnership and do business in Eugene under the partnership name of Valley Rental Service. The plaintiff had performed professional service for them in 1958. That service became the precursor of this action. The complaint prayed for general and punitive damages.

The plaintiff, as appellant, presents these two assignments of error:

"The court erred in ruling that the complaint failed to allege matters sufficient to constitute a libel per se."

"The court erred in sustaining defendants' motion for a judgment of involuntary non-suit."

In May of 1958 the plaintiff, at the defendants' request, prepared for them a partnership agreement which included a Buy and Sell Provision. For her

services she charged the defendants $115 which they paid. The defendants found no fault with the partnership agreement and were operating under it at the time of the trial.

Before the defendants employed the plaintiff to prepare the partnership agreement they did not inquire of her as to the likely amount of her charge. Nor did they ask other attorneys as to the amount charged by a lawyer for the preparation of a partnership agreement. They had assumed that the fee would be $35 or $50. When the defendants received the plaintiff's statement of her charge they voiced no disapproval and asked no questions. They paid it promptly.

The above incidents occurred prior to May 1958. The exact time is not revealed by the record. May 22, 1958, the plaintiff learned that the defendants were dissatisfied with the fee which she had charged and they had paid. Upon that day she wrote the defendants a letter of which the following, omitting formal matters, is a copy:

> "As I understand that you were more than a little upset with my recent statement to you although you promptly paid it, enclosed herewith is my check in the sum of $115.00.
>
> "My purpose in practicing law is to be of assistance to my clients; it is generally accepted that law at the present time is not a lucrative field; service is more important than fees and I value your good will more than any sum of money; this should have been indicated by my request that you call me if you had any question on the amount of the fee.
>
> "I trust you have found the partnership papers satisfactory and I would be happy to complete the change of title on the property if you wish—without

charge to you—as I feel it is an unfinished matter under the existing circumstances.

"Again let me assure you that I value good-will from you more than any amount of fee and that your objections in this matter should in no wise reflect upon Lloyd Thomas. He is a good insurance representative and considers his clients' needs carefully."

The above letter was accompanied with the plaintiff's check in the amount of $115 payable to the defendants.

The defendants' place of business includes a room to which the plaintiff's brief refers as a "restroom." The defendants' brief terms it "a storeroom and utility room." The record does not disclose its size. In it there is a toilet and a wash bowl. A part of its walls contain shelves upon which the defendants placed supplies and items of equipment. Other parts of its walls were posted with printed material which a witness for the plaintiff described as "instructions and maintenance bulletins to go with the equipment which the company had to operate and maintain." Apparently the defendants, instead of maintaining a file for the bulletins, posted them on the walls.

A week after the defendants received the plaintiff's letter one of them, Dale Morris, wrote in its upper left corner "Strad and Dale read this daily lesson #15" and in its upper right corner wrote "Going fee is 35 to 50 dollars." Stradley is the surname of one of the defendants; Dale is the Christian name of the other. Morris fastened together the letter, the plaintiff's statement (for $115) and the plaintiff's check which returned the fee; he then posted the combined documents upon the wall of the utility room. It remained there until October 1962 when a letter from counsel for

the plaintiff demanded its removal. Since Morris attached the plaintiff's check to her letter when he fastened the letter to the wall in May of 1958, and since it remained there until the letter was removed in October 1962, it appears that the defendants did not accept the return of the fee. The record does not reveal the significance of the words "Strad and Dale read this daily lesson #15."

The defendants had three to five employees. The latter had access to the utility room. An occasional customer of the defendants used the plumbing of the utility room when he visited the defendants' place of business. One of them who was a friend and client of the plaintiff saw the plaintiff's letter in October, 1962, while it was fastened to the wall. He told the plaintiff about it and thereupon the letter from counsel for the plaintiff, which we have mentioned, caused its removal.

The plaintiff argues that the posting of her check, statement and letter, with the defendants' notations thereon, constitutes defamation. She depends especially upon *Peck v. Coos Bay Times Publishing Co.,* 122 Or 408, 259 P 307; *Marr v. Putnam,* 196 Or 1, 246 P2d 509. Those decisions gave extensive attention to the rules which determine whether a challenged writing is defamatory. *Murphy v. Harty,* 238 Or 228, 393 P2d 206, which was decided after the briefs in this case were filed, gave further attention to that legal principle. Since the rule has received careful attention by this court, some of it very recently, we do not need to analyze the principle in this case.

■ *Marr v. Putnam,* supra, held:

"Whether an article is libelous per se is a matter of law for the court to determine. *Peck v. Coos Bay Times Publishing Co.,* supra, 122 Or 418, and

cases cited; *Kilgore v. Koen,* 133 Or 1, 9, 288 P 192. In the Coos Bay Times case this court approved the following definition of libels actionable per se taken from 36 CJ, Libel and Slander, 1164, § 28:

" '* * * defamatory words to be libelous *per se* must be of such a nature that the court can presume as a matter of law that they will tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided.' "

The following is taken from Restatement of the Law, Torts, Chapter 24, § 573, page 177:

"One who falsely and without a privilege to do so, publishes a slander which ascribes to another conduct, characteristics or a condition incompatible with the proper conduct of his lawful business, trade, profession, or of his public office whether honorary or for profit, is liable to the other."

The question now occurs whether the defendants' publication ascribed to the plaintiff conduct, in charging $115 for her services, that defamed the plaintiff. The test is how the defendants' words would be understood by readers of ordinary intelligence.

The plaintiff contends that the above quoted publication accused her of having charged an exorbitant fee. She argues that an accusation of that kind made against a practicing attorney is defamatory. She cites *Sanderson v. Caldwell,* 45 NY 398, 6 Am Rep 105; *White v. Hanks,* 255 SW2d 602 (Ky); *Proto v. Bridgeport Herald Corporation,* 136 Conn 557, 72 A2d 820; *Clemmons v. Danforth,* 67 Vt 617, 48 Am St Rep 836; 33 Am Jur, Libel and Slander, Sec. 69. None of those decisions held that a statement, without more, that declared that an attorney charged an exorbitant fee was defamatory.

We will now review those cases and several others that have come to our attention.

In the Sanderson case the plaintiff, an attorney, became a candidate for public office. The defendant's newspaper described him as an "extra-radical candidate," and said he "did a good thing, in his sober moments, in the way of collecting soldiers' claims against the government, for a fearful per centage. The blood-money he got from the 'boys in blue,' in this way, is supposed to be a big thing * * * the soldiers and sailors are out in full force against him." The court, in holding that the article was libelous per se, said:

> "To say of one, that in his sober moments he collected soldiers' claims against the government at a fearful per centage, is, or at least may be, equivalent to a charge of drunkenness, and of unjust and extortionate conduct in the prosecution of his business.
>
> "If the words 'sober moments,' in connection with the context, referring to the plaintiff as an 'extra radical candidate' for the Assembly, could have been construed in an innocent sense, it was for the jury to ascertain the real sense in which they were used * * * ."

In that case the publication charged drunkenness, "blood-money," extortionate conduct, and other wrongs.

*White v. Hanks,* supra, did not concern attorneys. Both plaintiff and defendant were automobile dealers. One of them sold to the other a used automobile and thereupon the buyer, in the presence of a third party, made statements about the seller which the latter claimed constituted defamation per se. The trial court sustained a demurrer to the complaint and in affirming the resulting judgment the appellate court said:

> "The only trouble is, that the facts of this case

do not fall within that rule. * * * We find nothing in the words complained of that even directly or indirectly imports fraud, dishonesty, or sharp or unethical practice on the part of appellant."

In *Proto v. Bridgeport Herald Corporation,* supra, the plaintiff was not an attorney but operated a grocery store. He claimed that an article which the defendant published and which charged that he had entered into an arrangement whereby he would obtain black market butter was libelous per se. The court said:

"Because of the fact that at the time the article was published there was no longer any law or government regulation limiting the quantity of butter which might be sold, the charge of black market trading might more properly be interpreted as a charge of unethical rather than illegal practice. * * *"

That case was not concerned with a publication which spoke of an overcharge.

In *Clemmons v. Danforth,* supra, the plaintiff, a physician, presented a claim against the estate of his deceased father-in-law for professional services rendered to the deceased. The defendant, an heir to the estate, in seeking the defeat of the claim, said in the course of a judicial hearing: "This isn't the first time he has made up an account, either. He made up one against me of between forty and fifty dollars * * *." The plaintiff alleged that those words defamed him. The defendant claimed that the words were not actionable because spoken in a judicial proceeding and therefore privileged. The court held that the words were not material and were therefore not privileged. They were deemed actionable. It will be noticed that the publication charged more than one wrong.

*Mosnat v. Snyder,* 105 Iowa 500, 75 NW 356, was an action for libel that was based upon a letter written by the defendant, an Iowa attorney, to one Charles Kipp, a Pennsylvania attorney. The letter concerned the estate of a deceased by the name of John M. Zeller which was under probate in Iowa. Kipp, to whom the letter was addressed, represented some of the heirs of the estate. He had employed the defendant to protect their interests. The defendant's letter was lengthy. The following is quoted from it:

> "We are looking into the doings of this tribe of attorneys. It looks very much as though they put their heads together and each of them gets as much out of the estate as possible. An outside attorney told me a few days ago that Mosnat had put a lien on the estate for $1,250 on account of the heirs you represent, and $500 extra to fight the church, making $1,750 for one and the same thing. Outrage!"

The court held that the statement was libelous per se. It stated:

> "Without any doubt, the letter speaks of the charges as outrageous and exorbitant.    *    *    *    Nothing in the letter can take from that language the meaning that the plaintiff and others from appearances, were acting together to wrongfully take from the estate as much as possible.    *    *    *    The language of the paragraph, to us, admits of no other conclusion than that the plaintiff, in his professional capacity, had acted outrageously, dishonestly, in taking from the estate.    *    *    *"

In coming to its conclusion, the court said:

> "The word 'outrage' is variously defined, and the particular definition to be applied should be the one indicated by considering the word in the connection in which it is used. It signifies a bold or wanton injury to person or property, wanton mis-

chief, gross injury, etc. Under all definitions, it is an aggravated wrong. * * * Nothing in the letter can take from that language the meaning that the plantiff and others, from appearances, were acting together to wrongfully take from the estate as much as possible. The statement is absolutely inconsistent with honest purposes, and must be so understood. * * *"

The publication clearly charged more than one wrong.

The following is taken from *November v. Time, Inc.*, 13 NY2d 175, 194 NE2d 126, in which the plaintiff, November, was an attorney.

"* * * If that were the whole of it there would probably be no defamation since, as we will assume, the rule still holds that language charging a professional man with ignorance or mistake on a single occasion only and not accusing him of general ignorance or lack of skill cannot be considered defamatory on its face and so is not actionable unless special damages are pleaded (Foot v. Brown, 8 Johns. 64, 68; Twiggar v. Ossining Printing & Publishing Co., 161 App. Div. 718, 146 N.Y.S. 529). * * *

"* * * Plaintiff is a professional man. 'If, on their face, they [the words] are susceptible in their ordinary meaning of such a construction as would tend to injure him in that capacity, they are libelous *per se* and the complaint, even in the absence of allegation of special damage, states a cause of action' (Kleeberg v. Sipser, 265 N.Y. 87, 91-92, 191 N.E. 845, 846). The courts 'will not strain' to interpret such writings 'in their mildest and most inoffensive sense to hold them nonlibelous' (Mencher v. Chesley, 297 N.Y. 94, 99, 75 N.E.2d 257, 259). The words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed (Sydney v.

Macfadden Newspaper Pub. Corp., 242 N.Y. 208, 214, 151 N.E. 209, 210, 44 A.L.R. 1419). 'The casual reader might not stop to analyze, but could easily conclude that plaintiff is a crook and let it go at that' (Van Voorhis, J., in Cassidy v. Gannett Co., 173 Misc. 634, 639, 18 N.Y.S.2d 729, 734)."

The article attributed to the plaintiff a planned course of wrongful conduct.

*De Pasquale v. Westchester Newspapers,* 170 Misc. 268, 8 NYS2d 829, presented facts more nearly resembling those in the case at bar than any that we have so far reviewed. In that case the plaintiff was a physician. He claimed that he was libeled in his profession by the following publication:

"Supervisor Harold W. Davis reported that when Dr. Ralph De Pasquale had declined to lower his bill of $25. for treating a welfare case late at night he had acquainted the Mayors of the three villages that other doctors might be obtained for lesser fees."

In holding that the publication was nonlibelous, the court said:

"To support the complaint it must definitely appear that the construction for which plaintiff contends is the only possible one for he is pleading no innuendo. * * *"

In resolving the issue, the court, referring to the publication, stated:

"* * * They charge him with no misconduct, with no dishonesty, with no extortion, with no unprofessional conduct. They simply say that plaintiff declined to lower his bill for professional services and that the Supervisor acquainted the Mayors of certain villages that other doctors might be obtained for less money. Wherein is the libel; wherein did it necessarily imply unprofessional conduct on

the part of the plaintiff, much less unfair, unjust or dishonest dealings? They certainly do not disparage his personal reputation and I think it is equally true that they do not disparage or prejudice him in his profession. There are no words that attacked either by direction or indirection, his professional ability or indeed, his professional ethics. There is nothing in the article from which a casual reader could gather that the services rendered by the plaintiff were not worth the amount charged by him. Members of a profession have varying standards of charges according to their standard, experience and the character of their patients or clientele. As a general proposition, to damage a person's reputation, the words spoken must impute a general misconduct. That is certainly not present in the instant case."

■ It is now our duty to determine whether the comments that the defendant Morris wrote upon the plaintiff's letter amounted to libel; that is, that it ascribed to the plaintiff "conduct, characteristics or a condition incompatible with the proper conduct of his * * * profession * * *." We have noticed that the meaning of a publication is that which the reader correctly or mistakenly, but reasonably, understands it to have. Restatement of the Law, Torts, § 614, states:

"(1) The court determines whether a communication is capable of a defamatory meaning.

"(2) The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient."

*Peck v. Coos Bay Times Pub. Co.*, supra, is in accord with that statement.

■ The person who read the words "Going fee is 35 to 50 dollars" did not know who wrote those words nor the source of his information. Obviously, a person

of average intelligence, before coming to a conclusion adverse to the attorney would like to have knowledge capable of supporting his conclusion. The scant information yielded by the words "Going fee is 35 to 50 dollars" afforded no impression as to the extent of the variation in fees dependent upon the difficulties encountered by the attorney in drafting an agreement for a complicated, as opposed to a simple, partnership.

Neither the words "Going fee is 35 to 50 dollars" which the defendant Morris wrote upon the plaintiff's letter, nor any other words in the posted material questioned the plaintiff's ability, learning, or character. Nothing in the posted material attributes to the plaintiff anything of a criminal or unlawful nature.

"Going fee," we believe, means the prevailing fee, that is, the normal charge. All partnership agreements are not alike, and all attorneys do not give the same attention to the request of the client who wishes a partnership agreement prepared.

In the case at bar the publication referred to only one charge that the plaintiff had made for her services. As we have seen, it made no criticism of that charge except to suggest that it was more than "the going fee." The publication attributed to the plaintiff no evil purpose and no lack of fitness for the practice of the law. It went no further than to indicate that in that one instance she charged her clients more than "the going fee." Very likely, the better attorneys, that is, those who have the superior talents and who are more cautious in the preparation of documents, charge more than those whose methods are hasty and cursory. If a lawyer can be defamed when it is said of him that he charges more than "the going fee," the members of the profession whose services are in superior demand because of their practice of consulting the law

books and familiarizing themselves with the facts before they draft a document will be peculiarly susceptible to defamation. We do not believe that a mere statement that a lawyer charged more than "the going fee" establishes defamation. Such a statement does not even indicate that the fee was unreasonable. It does not say that it was unconscionable, outrageous, or otherwise prepostrous, nor does it attribute to the lawyer anything of an evil nature. In the present instance the plaintiff promptly tendered back the fee when she received inkling of her clients' displeasure. The tender was not accepted.

We do not believe that the publication defamed the plaintiff. We have found no merit in the assignment of error.

Affirmed.

SLOAN, J., specially concurring.

I agree that the words used here were probably not defamatory. However, I concur with the same reservation expressed by Mr. Justice DENECKE, in his special concurring opinion in *Murphy v. Harty,* decided June 17, 1964, found at 238 Or 228, 250, 393 P2d 206, 217.

GOODWIN, J., specially concurring.

I concur in the result reached by the majority, and agree that the writing involved in this case was not defamatory on its face. Therefore it was not libel per se. However, I prefer not to decide in this case whether or not the writing, in all the circumstances, could have been found to be defamatory as libel per quod. (For a discussion of the distinction between libel per se and libel per quod, see Prosser, *Libel Per*

*Quod,* 46 Va L Rev 839 (1960), and Prosser, Torts 766, 782, §§ 106, 107 (3d ed 1964).)

Having assumed that in Oregon it is necessary to allege and prove special damages if one seeks redress for a libel that is not defamatory on its face, the appellant has relied entirely on a theory that the publication was defamatory per se. We hold that it was not. That is all we should hold in this case.

There is some confusion in the Oregon law as to whether or not it is necessary to allege and prove special damages in order to recover for a libel per quod. The most recent pronouncements of the court suggest that it is necessary to allege and prove special damages. *Hudson v. Pioneer Service Co.,* 218 Or 561, 346 P2d 123 (1959). See also *Ruble v. Kirkwood,* 125 Or 316, 266 P 252 (1928); *Peck v. Coos Bay Times Pub. Co. et al.,* 122 Or 408, 259 P 307 (1927); cf. *Marr et al. v. Putnam et al.,* 196 Or 1, 246 P2d 509 (1952); *Reiman v. Pac. Devel. Society et al.,* 132 Or 82, 284 P 575 (1930). (And see Prosser, *Libel Per Quod,* 46 Va L Rev 839, 846, footnote 50; Dean Carpenter's discussion of the Oregon decisions in 7 Or L Rev 353 (1928); and Mr. Justice DENECKE's specially concurring opinion in *Murphy v. Harty,* 238 Or 228, 250, 393 P2d 206, 217 (1964).)

The pleadings in the case at bar, however, do not present a suitable vehicle for the re-examination of the rule that special damages must be shown in order to recover damages for defamation not actionable on its face.