Matus *v.* Triangle Publications, Inc. et al.,
Appellants.

Argued May 6, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

reargument refused February 4, 1972. ▮

*Jacob Kalish,* with him *Donald M. McCurdy, Dilworth, Paxson, Kalish, Kohn & Levy,* and *Fox and McCurdy,* for appellants.

*Frank J. Marcone,* for appellee.

OPINION BY MR. JUSTICE POMEROY, December 20, 1971:

This appeal involves defamation by radio, and presents two questions: (1) whether the statement made

relative to plaintiff-appellee was actionable, and (2) whether defendants' admitted conditional privilege was exceeded and so lost.

Appellee brought this action in trespass against Triangle Publications, Inc., owner of WFIL radio station, and James Gerhart, its employee, appellants, charging that Gerhart had "falsely and maliciously uttered words over the air waves, stating that plaintiff, by his agents, had grossly overcharged the wife of James Gerhart to plow her driveway"; that the words uttered were false and that Gerhart knew or should have known them to be so; and that in consequence appellee had been injured in his good name, credit and reputation, to his damage. The answer pleaded, under "New Matter", that the statements were privileged, having been made in good faith, with sufficient cause for believing them to be true, on a proper occasion, from a proper motive and as a matter of public interest, information and comment. After trial before a jury a verdict was returned in favor of appellee and against appellants in the amount of $13,500.[1] A motion for new trial was overruled, and this appeal followed.[2]

The salient facts are as follows: Appellee owned and operated a garage from which he conducted, as the weather warranted, snowplow operations in winter.[3]

--------

[1] The verdict was solely for compensatory damages; punitive damages were not sought and the court charged that the jury was "not to consider punishing the defendants for their actions."

[2] Appellants filed no motion for judgment n.o.v., but asserted as one ground for new trial that the trial court erred in refusing appellants' motion for nonsuit at the close of plaintiff's case. The court correctly held that the refusal of a nonsuit is not ground for a new trial, and was not properly before the court on the new trial motion. See *F. W. Wise Co., Inc. v. Beech Creek R.R. Co.*, 437 Pa. 389, 263 A. 2d 313 (1970), footnote 2 at p. 392.

[3] Appellee was also a full time police officer of Radnor Township, Delaware County. The alleged defamatory utterance, however, had to do only with his activity as a snow-plow operator,

Appellant Gerhart was the host of a "talk show" broadcast daily from 6:00 a.m. to 10:00 a.m. over radio station WFIL in Philadelphia, which station was owned and operated by appellant Triangle Publications, Inc. The "show", according to Gerhart, was "a conversation program, using the telephone", in which a little music was played but, "by and large it is a conversation with people on the telephone, discussion of local matters, issues, things of interest locally."[4]

On the evening before the broadcast in question a heavy snowstorm, 12 to 18 inches in depth, had struck the Philadelphia area. Gerhart spent the night at a motel near the radio studio to facilitate his getting to work the next day. During a newscast intermission in the talk show the following morning, Mrs. Gerhart telephoned her husband. She related, among other things, that on the preceding evening she had had their driveway at home plowed by Mr. Matus, and that the charge for this work had been $35. Mrs. Gerhart testified that her husband "got a little mad" on hearing the cost. Gerhart himself testified that he "was rather staggered" and "thought it was an exorbitant price. . . ." Returning to the air following the newscast, Gerhart engaged the newscaster in conversation on the subject of snowplowing, and said he had been charged $35 for having his own driveway plowed. The newsman asked who had done the job, and Gerhart replied, as he testified, "I

---

and appellee's vocation as a policeman was not a factor in the case. Appellants do not base their claim of privilege on the ground that appellee was a "public figure" within the meaning of *New York Times v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686 (1964).

[4] The opinion of the lower court, in denying the defendants' new trial motion, stated that defendants' program was not one of criticism and comment. According to defendants' own evidence, said the court, "[i]t was a 'talk' show, with audience participation. There was no expertise or critical evaluation of literature, art, public figures, events or the like. Its purpose and format were for entertainment, general information and non-critical comment."

don't know . . . I got the name from Sue [Mrs. Gerhart] during the news. I think it was a company called Matus or something like that." There followed a discussion in which, as he said, Gerhart issued a "moral warning", that "goodness sake, watch out for this kind of thing going on". Gerhart testified that "people called in, and they would relate similar incidents . . . nobody seemed able to top that one, however, on that particular day".

Three others in addition to Gerhart testified concerning the broadcast: Matus himself and two acquaintances, one a customer and one a fellow police officer. The customer, one Schultz, could not recall what was said, but did remember hearing Matus' name mentioned in "a short conversation about the snowplow business and didn't think that was too right". He was then asked:

"Q. What was your reaction to hearing that?

"A. Well, I shook my head. I said maybe instead of [that] guy giving me a break all the time, he is putting it to me."

The police officer, Burgess, while not recalling the words used, remembered the broadcaster "saying something about the fee that was charged was out of line. It was much too high and people like this shouldn't be in business, and he mentioned the name Matus". Matus himself heard only a tape replay of the program at the WFIL studio after suit was brought. He testified: "He [Gerhart] said that this Matus garage had plowed his driveway and charged him $35 and his wife was home alone, and people like this, taking advantage of a woman at home alone, and he said they shouldn't be in business." Asked how long the "announcement" took, Matus replied: "He talked about it for a couple of minutes and then later on in the show he got a call, I believe, from a lady in New Jersey, and she said that was outrageous, and she was talking to him about it and didn't mention my name again. And later on in the show he

made a remark about it again but didn't mention my name."[5]

Appellant Gerhart's wife testified that the driveway had been plowed in response to two telephone calls she had made to Matus' garage. She said that after the plowing she had paid a Mrs. D'Angeli, who came to the door from the snowplow vehicle and announced "I am here to collect for Matus", explaining that "he" was in the truck. Mrs. Gerhart said, "I guess I did get a little upset, but I paid her the cash and she left."

Matus in rebuttal denied having received any telephone call from Mrs. Gerhart to plow her driveway, denied that he had plowed it, and denied that he had authorized or contracted with anyone else to plow it. In refutation of these denials, appellants produced Mr. D'Angeli, who testified that he had been asked by Matus to plow a couple of driveways on the night in question, including Gerhart's, that he had done so, and that Mrs. D'Angeli, who was with him on the plow vehicle, had indeed collected $35. The witness stated that he considered this charge reasonable for a circular 75′ driveway under the drift conditions he encountered. He testified that his arrangement with Matus was that Matus was to receive $20 for the job, and that the witness paid him this sum a day or two later.

In his program on the morning following the broadcast involved, Gerhart made a retraction based on Matus' statement to him in the interval that Matus had not plowed the driveway.[6]

---

[5] The tape or a written transcription of the broadcast would obviously have been the best evidence of what was said but neither one was offered by either Matus or appellants.

[6] Matus testified on cross-examination that in his retracting statement Gerhart said: "I have to eat crow today. It is just one of those unfortunate things that reputable businessmen in town have to suffer by a few people who use their names and do bad things."

Appellants' first argument on this appeal is that the words used by Gerhart were not actionable because they did not touch appellee in his business or profession; that they did not "impeach" Matus' skill, knowledge or professional conduct. The basis of this contention appears to be that the broadcast statement referred to but one incident of overcharge and not to a course of conduct; there was no suggestion in the broadcast that his services were unsatisfactory or unworkmanlike. While we might be inclined to agree that the appellee presented a marginal case of libel *per se,* particularly since the exact words employed were never introduced in evidence, we decline to consider this assignment of error. As noted above (footnote 2), appellants did not move for judgment notwithstanding the verdict, nor do they now press insufficiency of the evidence as ground for a new trial.[7] Moreover, the brief of appellants seems to concede that the trial court was not in error in its preliminary finding that the words allegedly used were capable of a defamatory meaning. Appellants' assertion that the court's charge in effect told the jury that they should find that the words used were understood by the recipients to be defamatory is without merit; viewed as a whole, the portion of the charge dealing with this aspect was not erroneous.[8]

---

[7] The contention made below that the verdict was grossly excessive has likewise been abandoned on appeal.

[8] The court charged as follows: "The Court in this case has determined that the language used was capable of a defamatory meaning, because overcharge means overreaching or unfair or unethical business conduct, and we, you and I, are to interpret words as they would naturally be understood by a person hearing them.

"Now, it is for you to determine whether the statements, which were capable of a defamatory meaning, did in fact have such a meaning, and were so understood by the persons hearing the broadcast."

Appellants next urge that the court erred in its charge as to loss of privilege. The court charged that the appellants, as a radio broadcasting station and an employee of the station, respectively, in conducting a program of discussion and comment about local matters, had a conditional privilege. This was not disputed by appellee. The court went on to charge that because of this privilege appellee could not recover unless he proved that the statements in question were false, and were made either with knowledge of the falsity or "without reasonable care to ascertain their truth or falsity before making them." The words "without reasonable care" were equated with negligence, which was properly defined in terms of lack of that due care which a reasonable man would have used under the circumstances to ascertain whether the statements were true before giving them currency. The court declined appellants' points for charge which would have required appellee, in order to destroy the conditional privilege, to prove by clear and convincing evidence either (1) knowledge of falsity or (2) actual malice in making the statements, defined as reckless disregard of whether the statements were true or false. The court thus employed the traditional Pennsylvania law on the subject of conditional privilege, without reference to the federal constitutional dimension of the privilege as it has recently evolved.

In *Summit Hotel Co. v. National Broadcasting Company,* 336 Pa. 182, 8 A. 2d 302 (1939), this Court was presented with its first case of defamation through a radio broadcast. Speaking through Mr. Chief Justice KEPHART, the Court said: "In considering the basis of liability for defamation by radio and in balancing the conflicting interests, due regard must be had to the rights of all parties, and to the ultimate and collateral effects any pronouncement might have on public interests. A rule unalterably imposing liability without fault on the broadcasting company under any circum-

stances is manifestly unjust, unfair and contrary to every principle of morals. A fair aspect of the harm to the persons injured must be considered as well as the circumstances under which the incident occurred." The Court there held that the broadcasting company was not liable for a nonemployee's false defamatory statement ("that's a rotten hotel") interjected into a prepared script which the company had inspected and edited and where it had no reason to believe that an extemporaneous defamatory remark would be made. But the opinion added that "[w]here the broadcasting station's employee or agent makes the defamatory remark, it is liable, unless the remarks are privileged and there is no malice."[9] No claim of privilege was there asserted. We have had occasion recently to make an exhaustive analysis of the Pennsylvania law of defamation: *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 273

---

[9] The Court took note of the debate going on at the time of the decision as to whether publication of defamatory matter by radio was to be considered as slander or as libel. It did not fully resolve the issue for Pennsylvania, stating, "[T]he danger of attempting to apply the fixed principles of law governing either libel or slander to this new medium of communication is obvious"; it refused, however, to impose a rule of liability without fault on a radio broadcaster, as some states had done by analogy to their rules relating to newspaper publishers. In *Purcell v. Westinghouse Broadcasting Co.*, 411 Pa. 167, 191 A. 2d 662 (1963), the opinion of the Court observed, in passing, that "the common law distinctions between these two terms [libel and slander] [are] not being applicable to the law of radio." See also *Rosenbloom v. Metromedia, Inc.*, 289 F. Supp. 737 (D.C. E.D. Pa. 1968), rev. 415 F. 2d 892 (C.A. 3d Cir. 1969), affirmed 403 U.S. 29, 29 L. Ed. 2d 296 (1971) ; *Restatement of Torts*, §568, comments *b* and *d*, pp. 159 et seq. Note *Developments in the Law—Defamation*, 69 Harv. L. Rev. 875, 887 (1956). In the case at bar the plaintiff characterized the tort for which he sought recovery as "slander". We prefer to use here the broader term "defamation", which is the term used in the Act of August 21, 1953, P.L. 1291, §1, 12 P.S. 1584a, and the Restatement of Torts section (Section 613) on which the Pennsylvania statute is based.

A. 2d 899 (1971). We there reviewed the basis of the defense of privilege under Pennsylvania law and the modifications thereof necessitated in situations where a public official or public figure is the object of the libel by the decision in *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686 (1964). We there stated: "The privilege spawned in New York Times Co. v. Sullivan, supra, and elaborated upon in subsequent cases is a qualified privilege, albeit one of constitutional stature. It is of the same genre as that discussed above, although because of its constitutional stature, not encumbered by all the intricacies related thereto established by prior Pennsylvania case law. And, most importantly, what may constitute an abuse thereof has been declared by the United States Supreme Court. That is, *to overcome the constitutional privilege, the plaintiff must prove that the defendant was actuated by 'actual malice', i.e., published the communication 'with knowledge that it was false or with reckless disregard of whether it was false or not.'*" 441 Pa. at 453. (Emphasis supplied.)

The *New York Times* rule has been expanded considerably in the seven years since it was first enunciated. The most recent extension by the United States Supreme Court was in its decision in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 29 L. Ed. 2d 296, 39 L.W. 4694 (1971). That case, originating in the District Court of the United States for the Eastern District of Pennsylvania and involving the Pennsylvania law of defamation by radio,[10] presented the question "whether the New York Times knowing or reckless falsity standard applies in a state civil libel action brought not by a 'public official' or a 'public figure' but by a private individual for a defamatory falsehood uttered in a news

---

[10] Pennsylvania libel law is succinctly summarized in the opinion of the Court by Mr. Justice BRENNAN. 403 U.S. 37-38.

broadcast by a radio station about the individual's involvement in an event of public or general interest." 403 U.S. 31-32. The Court, affirming the Court of Appeals for the Third Circuit, held that the *New York Times* standard did apply. The "event of public or general interest" involved in *Metromedia* was the prosecution of the plaintiff for a violation of the obscenity laws of Philadelphia resulting from his distribution of nudist magazines. A plurality of the court[11] held that this event was one of public concern because "[t]he community has a vital interest in the proper enforcement of its criminal laws, particularly in an area such as obscenity where a number of highly important values are potentially in conflict: the public has an interest both in seeing that the criminal law is adequately enforced and in assuring that the law is not used unconstitutionally to suppress free expression." 403 U.S. 43. Said the plurality opinion:

"We honor the commitment to robust debate on public issues, which is embodied in the First Amendment, by extending constitutional protection to all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous.

". . . It is clear that there has emerged from our cases decided since New York Times the concept that the First Amendment's impact upon the state libel laws derives not so much from whether the plaintiff is a 'public official', 'public figure', or 'private individual', as it derives from the question whether the allegedly defamatory publication concerns a matter of public or

---

[11] The plurality opinion was by Mr. Justice BRENNAN, joined by Chief Justice BURGER and Mr. Justice BLACKMUN. Mr. Justice BLACK and Mr. Justice WHITE filed separate opinions concurring in the judgment. Mr. Justice HARLAN and Mr. Justice MARSHALL filed separate dissenting opinions, the latter being joined by Mr. Justice STEWART. Mr. Justice DOUGLAS did not participate.

general interest. See T. Emerson, 'The System of Freedom of Expression', 531-532, 540 (1970). In that circumstance we think the time has come forthrightly to announce that the determinant whether the First Amendment applies to state libel actions is whether the utterance involved concerns an issue of public or general concern, albeit leaving the delineation of the reach of that term to future cases." 403 U.S. 44-45.

On the preliminary question of extending the reach of *New York Times* to matters of public or general concern, there was no disagreement among the five members of the Supreme Court who wrote or joined in opinions in support of the judgment affirming the Court of Appeals.[12] We therefore accept this modification of the law of defamation in Pennsylvania, and with it the corollary that in such cases the reasonable care standard must give way to the more stringent standard of knowing or reckless disregard of falsity. Specifically, we adopt as binding on us the holding of the plurality opinion in *Rosenbloom,* viz.: "We thus hold that a libel action, as here, by a private individual against a licensed radio station for a defamatory falsehood in a newscast relating to his involvement in an event of public or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not." 29 L. Ed. 2d 316.

The question remains whether the defamatory utterance in the case now before us was related to Matus'

---

[12] Mr. Justice BLACK would not, however have rested at that point, but favored a rule "to the effect that the First Amendment was intended to leave the press free from the harassment of libel judgments." 403 U.S. 57. Mr. Justice WHITE, for his part, would have confined the holding to the facts of the case before it, that is, limit it to issues involving "official actions of public servants." 403 U.S. 61.

"involvement in an event of public or general concern." We conclude that it was not.

Determination of this question involves the process of "delineation of the reach" of those terms, which the United States Supreme Court said must be left to future cases. The plurality opinion in *Rosenbloom*, construing the Court's decision in *New York Times*, indicated that the constitutional protection was not to be limited to "matters bearing broadly on issues of responsible government". It cites several examples of the public or general concern concept: federal efforts to enforce a court decree ordering enrollment of a Negro student in a southern university, *Associated Press v. Walker*, 388 U.S. 130, 18 L. Ed. 2d 1094 (1967); an alleged "fix" of a college football game, *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 18 L. Ed. 2d 1094 (1967); "opening of a new play linked to an actual incident", *Time, Inc. v. Hill*, 385 U.S. 374, 17 L. Ed. 2d 456 (1967). Mr. Justice HARLAN, dissenting, terms the language of the plurality opinion on this point a "somewhat extravagant delineation of the public interest involved in the dissemination of information about non-public persons". 403 U.S. 71. Mr. Justice MARSHALL's dissent interprets the plurality opinion as placing a duty on courts to determine "what information is relevant to self-government". 403 U.S. 79.

The Court of Appeals for the Fourth Circuit has applied the protection of *New York Times* and *Rosenbloom* to publications charging that a former professional basketball player, now a college basketball coach, had played ludicrously, was "psychologically destroyed", and practically run out of organized basketball. *Time, Inc. v. Johnston*, 448 F. 2d 378, 40 L.W. 2145 (1971). The Federal District Court for the Northern District of Georgia has applied *Rosenbloom* to bar recovery for a television newscast that poor practices exist in the credit industry, holding that such practices are a matter

of national concern. *Credit Bureau of Dalton, Inc. v. C.B.S. News,* 332 F. Supp. 1291 (1971). 40 L.W. 2189.

In *Grove v. Dun & Bradstreet, Inc.,* 438 F. 2d 433 (C.A. 3d Cir. 1971), a Pennsylvania corporation engaged in the business of a brick and tile broker, alleged that it had been libeled by a false credit report which indicated an unsatisfied judgment against plaintiff. The jury found for the plaintiff and the district court denied post trial motions. The issue for decision in the Court of Appeals was whether that Court's decision in *Rosenbloom v. Metromedia, Inc.,* 415 F. 2d 892 (3d Cir. 1969), as to what is required under the First Amendment to overcome the conditional privilege applied to the Dun & Bradstreet publication. Defendant asserted that plaintiff's credit was "a matter of interest to a segment of the public, viz., its suppliers, creditors, architects and public contractors". The Court of Appeals, however, held that plaintiff's corporate activities were not "of real public interest". "We are not here dealing", said Judge ALDISERT for the Court, "with a publication or broadcast alleging, for example, that plaintiff caused substandard building material to be used in these projects. Such operative facts might constitute a matter of grave public interest. Our research discloses no case, however, which would support the application of the more rigorous standard to the covert reportage of the credit standing of a small brick and tile brokerage firm, and we decline to do so now."[13] 438 F. 2d at

---

[13] The Court also held, as an alternative ground of decision, that the *New York Times* standard was not applicable to a publication such as a credit report providing "specialized information to a selective, finite audience." Both grounds of decision in *Grove* were followed by the Court of Appeals for the Tenth Circuit in *Kansas Electric Supply Co., Inc. v. Dun & Bradstreet, Inc.,* decided September 20, 1971. 40 L.W. 2174. This Court has also followed *Grove* in *Baird v. Dun & Bradstreet,* 446 Pa. 266, 285 A. 2d 166 (1971).

436, 437. We recognize, of course, that the Court of Appeals decision in *Grove*, filed as amended on March 15, 1971, was prior to the Supreme Court's affirmance of the circuit court's decision in *Rosenbloom*. We see nothing in the Supreme Court's opinions in the latter case, however, which would have dictated a contrary result by the Court of Appeals in *Grove*.[14]

Returning to the facts in the case at bar, we have a patently anonymous plaintiff engaged in a one-man snow-plowing business as to whom a defamatory statement, established by the jury's verdict to have been false, is uttered in a radio "talk show" out of "a clear sky", but on a morning following a snow storm. The "announcer" states that his wife has been overcharged by plaintiff, calling him by name, for clearing their driveway of snow, and that "people like that shouldn't be in business". We have no doubt that Gerhart could with impunity talk all he wished about the weather (it is sometimes difficult to say enough bad things about the weather), and to discuss the problems of snow removal. We see no justification, however, for the interjection of Matus' name into the discussion or for the expression of opinion as to his business ethics or fitness to be in business. This was no contribution "to robust debate on public issues"; it was by no stretch of imagination a matter of public concern that Gerhart thought he or his wife had been bilked by Matus the evening before; it was but a matter of private pique. The great values of the First Amendment are not served by making it a haven for unprovoked and defamatory gossip-mongering of interest only to the speaker merely because he happens to be on the radio at the time of speaking. The "breathing space" which the Amendment requires in terms of modification of traditional libel

---

[14] Certiorari was denied in *Grove* on October 19, 1971. 40 L.W. 3179.

laws will not be restricted by the normal application of the law of Pennsylvania in this case. We hold, therefore, that the decision of the United States Supreme Court in *Rosenbloom v. Metromedia, Inc., supra,* does not require in this case the application of the rule that the appellants' conditional privilege could be defeated "only by clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not." On the facts before us, it was enough to defeat the privilege that the statement be shown by a preponderance of the evidence to have been uttered "without reasonable care and diligence to ascertain the truth." *Purcell v. Westinghouse Broadcasting Co.,* 411 Pa. 167, 179, 191 A. 2d 662 (1963). That standard was properly given to the jury in the charge of the trial court.

The judgment is affirmed.

Mr. Chief Justice BELL and Mr. Justice EAGEN concur in the result.

Mr. Justice COHEN took no part in the decision of this case.

---

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

Without regard to the momentous issues of constitutional law discussed at length in the majority opinion, I dissent and would reverse the judgment below and grant a new trial for the simple reason that the challenged publication is not defamatory.

Although a transcript or tape recording of the radio broadcast was not put in evidence and there is some uncertainty concerning exactly what was said on the air, the essence of the allegedly offensive statement was that Matus had overcharged the radio announcer's wife for clearing snow from the driveway of the announcer's home. The broadcast did not suggest that Matus was dishonest or unqualified or that the snow had been re-

moved in an unsatisfactory or unworkmanlike manner. I do not believe that a dissatisfied customer's mere statement that he was forced to pay too high a price for a particular service is actionable. See *Fowler v. Stradley*, 238 Or. 606, 395 P. 2d 867 (1964); *Lynch v. Lyons*, 303 Mass. 116, 20 N.E. 2d 953 (1939); cf. *De-Pasquale v. Weschester Newspapers, Inc.*, 170 Misc. 268, 8 N.Y.S. 2d 829 (1938); Prosser, Law of Torts, §111, at 739-40 (4th ed. 1971).

The majority concedes that plaintiff established at best only a marginal case of defamation but refuses to consider the issue because "appellants did not move for judgment notwithstanding the verdict, nor do they now press insufficiency of the evidence as ground for a new trial." While it is true that appellants did not seek judgment n.o.v., the record does not bear out the majority's assertion that appellants do not raise the issue of the sufficiency of the evidence. At the close of plaintiff's case, appellants moved for a compulsory nonsuit on the specific ground that plaintiff had failed to prove that the broadcast was defamatory. This same claim was reiterated in appellant's motion for new trial, and in their brief in this appeal. In these circumstances I fail to understand why the majority now declines to consider this assignment of error.

I dissent and would award a new trial, the relief requested by appellants.