**Martin S. PRAGER, Plaintiff,**

v.

**AMERICAN BROADCASTING COS., INC., Robert Blanchard, a/k/a Bob Blanchard and Ernest Anastos, Defendants.**

Civ. A. No. 82–4270.

United States District Court,
D. New Jersey.

July 25, 1983.

Kushner & Riley by Howard W. Kushner, Freehold, N.J., for plaintiff.

Connell, Foley & Geiser, Newark, N.J., Hawkins, Delafield & Wood, New York City, for defendants; Kevin R. Gardner, Newark, N.J., Laura V. Jones, New York City, of counsel.

## OPINION

BIUNNO, Senior District Judge:

This suit is grounded on two TV news broadcasts, one on Friday, March 26, 1982, and the other on Monday, March 29, 1982.

The major subject dealt with was a marketing program of International Diamond Corporation to sell diamonds for investment as an inflation hedge.

The discovery indicates that the marketing was done through independent contractor brokers making sales on a commission basis with the payments being sent by the brokers to the company which sent the diamonds by mail directly to the buyers.

From a structural standpoint there seem to have been some number of subsidiaries, one being a New Jersey corporation, on a territorial basis.

It also appears that individual independent contract sales representatives either channeled their sales through or were recruited by other independent contractors known as district managers who would receive an override commission on sales made by others as well as on their own.

The discovery documents show that plaintiff Martin Prager entered into a number of independent contracts with IDC both as a sales representative or account executive and as a district manager.

The first broadcast summarized the IDC offering of the sale of the diamonds for investment and suggested that before investing money with them, "You should hear what a Federal Grand Jury thinks of the plan."

The announcer said that there were allegations of fraud and misrepresentation, with top officers indicted and facing charges on the way they ran the company. Pictures of the Board Chairman, two Vice-Presidents and the National Sales Director were shown on the video portion. The name of the Board Chairman was spoken, the names of the others were not. Nor were they shown in the picture.

And along with the pictures there was spoken text mentioning a 12-count indictment in Missouri on charges ranging from fraud to misrepresenting the value of the diamonds. Mention is also made of similar charges filed in Minnesota.

There is also a clip of a tape showing a Federal Trade Commission spokesman whose name appears on the documents filed in the Northern District of California as a member of its legal staff. He speaks and says that the consumers were told that the diamonds were risk free and if you wanted to sell them they would buy them back. But in fact if you tried to sell them back they resisted. And if you went somewhere

else, say to a jeweler, you would be told there was no market for them.

So much of the story as has been described thus far is not defamatory of Mr. Prager as there is no reference to him in these segments. The suit is evidently filed because the Friday broadcast also showed clips of an attempted interview with Mr. Prager in a parking lot said to be near his office. There is no immediate spoken introduction to the clip.

The name of Martin Prager and of International Diamond Corporation are superimposed on the camera image, and Bob Blanchard asks him, "Do you know anything about the Grand Jury indictments, the charges of fraud, misrepresentation? Selling the diamonds at above retail level when the catalogue says they're being sold below retail level?"

Mr. Prager says: "Do I know anything?"

Bob Blanchard says: "About that?"

Prager then says: "No, I think that before you can make assumptions you, you have to have"—and Blanchard says: "Well, I have, I got the Grand Jury indictments right here."

Prager says: "No, before you make—no, no."

Blanchard says: "I do, they're right here, the indictments. Do you want to see them?"

And Prager says: "If you want to do an interview, then you have to do it fairly. You can't make assumptions without having the facts."

And Bob Blanchard says: "Well, here, do you want to see the indictments?"

And Mr. Prager says: "Can you excuse me for five minutes, I'd like to get a cup of coffee."

Then Prager is shown on again offering an interview on Monday at nine, to which Bob Blanchard agrees.

On Monday's broadcast there is a lead in from Friday's broadcast, followed by a brief clip taken on Friday, but not shown then, in which Mr. Prager says: "We are only one outlet of 700."

Bob Blanchard asks: "Are you, are you still?"

Prager replies: "We are closing down, we are fading fast."

Blanchard then reviews some of the Friday material about IDC, and there is a clip of another FTC spokesman who says substantially what the first one did. Then there is another clip from the Friday broadcast in which Mr. Prager is offering the interview on Monday at 9 A.M.

Finally Mr. Blanchard says: "Since last Friday Mr. Prager's lawyer told him not to talk to us. The attorney did tell us that Mr. Prager is very upset with our story; that he's not an officer of the company; that he runs a clean operation; and that no one has ever lost any money. Other than that, no further comment."

This full text as well as a videotape copy of the two broadcasts are stipulated and are in the records and the Court has examined them both with care.

Modern defamation law is fundamentally State Law with restrictions and modifications as imposed nationwide by paramount law, by virtue of the guaranty of free press and free speech in the First Amendment applied to the States through the Fourteenth Amendment. The history of these changes begins with *N.Y. Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and have continued on through *Gertz v. Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

Without repeating what the Supreme Court and the Court of Appeals in this Circuit has said about the history of these cases, they require certain modifications to State law where the charges are leveled against the media, whether print or broadcast or TV.

■ A public official may not press a claim unless he can show with convincing clarity or by clear and convincing proof that there was a publication with actual knowledge of falsity, or a high degree of awareness of probable falsity, that is reckless disregard for the truth, rather than negli-

gence such as a failure to investigate without more.

In the *Butts*[1] and *Walker*[2] cases the same rule was applied to claims by persons who were generally public figures, although not public officials.

For a period, as the result of the decision in *Rosenbloom v. Metromedia,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), a decision from this Circuit, it appeared that if the publication involved a public issue or a matter of general concern, the standard of *New York Times* would apply without regard to whether the plaintiff was a public or private individual.

However, the Supreme Court was highly fragmented on this issue. Only three members joined in the opinion. Two others concurred in the judgment only to form a majority but did not concur in the opinion.

It appears, too, that Pennsylvania seems to have adopted the *Rosenbloom* rule as State law.[3] But it is not evident that New Jersey has done so. Since then the Supreme Court has drawn back from the public issue formulation. This was in *Gertz v. Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). But at the same time the Court more specifically defined a limited public figure who was also required to meet the *New York Times* test.

In that case it also ruled that liability without fault will not be permitted under State law in any case, and that no damages, other than actual damages, will be allowed in any case unless the *New York Times* standard is met.

These changes, which apply in cases where the plaintiff is neither a public official or even a limited public figure, are grounded on a further balancing of the First Amendment guarantees of free speech and free press against other competing interests.

▇ Thus, the analysis must begin by considering whether Mr. Prager is a public official, a public figure, a limited purpose public figure, or a private individual. If he is any of the first three, he can advance no claim without overcoming the considerable hurdles of the *New York Times* test. The determination whether he is in any one of these three categories is a determination to be made by the Court. If he is merely private then he may recover under applicable State law meeting the *Gertz* minimum, but may recover only actual damage proved unless he is able to meet the *New York Times* standard.

The guide is the analysis of the Court of Appeals for the Third Circuit, in the case of *Systems Operations v. Scientific Games,* 555 F.2d 1131 (3rd Cir.1977), and the Restatement on Conflicts of Law, Second, Sections 149 and 150, as well as the single publication rule adopted by New Jersey in *Barres v. Holt,* 131 N.J.Super. 371, 330 A.2d 38 (Law 1974), affirmed 141 N.J.Super. 563, 359 A.2d 501 (App.1976), affirmed 74 N.J. 461, 378 A.2d 1148 (1977).

▇ The Court is satisfied that the motions before it today are governed by New Jersey law. The publication involved is a type that is called an aggregate publication. The Court takes judicial notice that all of the local TV stations in this New York Metropolitan area have their broadcast antennas in New York City and all reception from the line of sight limitation characteristic of TV broadcasts means that anything received in New Jersey comes across the State line.[4] And since Mr. Prager is an individual, a natural person, under the references cited the law of the State of his domicile controls his claim.

The Court also points out that even aside from that, the New Jersey law on foreign

1. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

2. *Associated Press v. Walker,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

3. See, the *Steaks Unlimited case,* infra, 623 F.2d 264 at p. 272 (CA–3, 1980), citing *Matus v.*

*Triangle Publications,* 445 Pa. 384, 286 A.2d 357, cert. den. 408 U.S. 930, 92 S.Ct. 2494, 33 L.Ed.2d 343 (1972).

4. See the discussion of this phenomenon in *Wolosoff v. Cable Systems, Inc.,* 93 F.R.D. 314, at p. 315 (D–NJ, 1981).

law, as is contained in the last sentence of New Jersey Evidence Rule 9, Paragraph (3), directs that in the absence of proof of the law of another jurisdiction, New Jersey is to apply New Jersey law.

Now, since the impact of paramount law in a case of this kind hinges on how the plaintiff is classified, that classification will control the question of what he must show. In any case, and for every category, of course, he must show, in any event, not only that what was shown and said was a defamation that was not true, but that it was of and concerning him. Otherwise it is not actionable by him.

Under the cases referred to, Mr. Prager is not seen to be a public official or a general public figure in the *Butts* and *Walker* sense.

It will be recalled in the *Butts* case that the plaintiff was a football coach about whom it had been written that he had fixed a football game. And it turned out that he was not on the payroll of the State University, he was paid by a private group of alumni. So he could not be a public official.

In the *Walker* case the plaintiff was a retired Army General, no longer in office, so he could not be classified as a public official.

The Court applied the same test it had used in the *New York Times* case to Mr. Butts and to General Walker, on the theory that they were general public figures, widely in the public eye for all purposes.

However, under *Gertz* the question is different. The question under *Gertz* is whether the individual voluntarily chose to become involved in the subject matter of the controversy, that is, by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the accused publication.

If the nature and extent of that publication is such as to rationally and naturally draw him into the controversy, then he is a limited purpose public figure, and the *New York Times* standard must be applied.

As I have said, this determination is for the Court, and under both the federal cases in this Circuit and those found in the New Jersey courts, it is a proper element to consider on a motion for summary judgment.

Two decisions in particular provide guides. In *Avins v. White,* 627 F.2d 637 (CA–3, 1980), a law school dean asked that the school be accredited by the American Bar Association. The process of looking into the school's operations and its standards led to an uncomplimentary report. Mr. Avins sued. The Court ruled, the Court of Appeals in this Circuit, that Mr. Avins was a public figure for the limited purpose of the inquiry and evaluation of the American Bar Association Committee.

Put in simple terms, the rationale was that he had invited the evaluation. He asked for it.

An earlier case, *Steaks Unlimited v. Deaner,* 623 F.2d 264 (CA–3, 1980), involved a suit by a meat producer based on a critical and uncomplimentary TV broadcast on a consumer affairs presentation.

The meat producer was determined to be a public figure for the limited purpose of the controversy since it had undertaken an advertising campaign to sell frozen steaks with allegedly inaccurate and misleading claims about price and quality. As the Court said: "In short, through its advertising blitz, Steaks invited public attention, comment and criticism." 623 F.2d at 274.

Here the broadcast program about International Diamond Corporation rested on the Missouri indictment of five individuals in that company filed December 4, 1981 with $100,000 surety bail set for each defendant.

It also rested on the Minnesota consumer fraud suit for civil penalties in which a summons was issued February 11, 1982 naming the parent corporation, its Minnesota subsidiary and three major officers.

It also rested on the Federal Trade Commission civil complaint filed March 4, 1982, in U.S. District Court for the Northern District of California. This complaint named the parent corporation and four major officers.

Thus the basic story about International Diamond Corporation was on a developing time scale, at least so far as these three sets of charges are concerned, over the three-month period, from early December, 1981 to early March, 1982, even though the only publications involved in this suit are the broadcasts on Eyewitness News of March 26 and March 29, 1982.

Nothing in the complaint or in the broadcasts remotely suggests that anything shown or said about International Diamond Corporation, or about the officers portrayed as the subject of the indictment, could provide any kind of ground for any kind of action by it or them for defamation or other claims related thereto, or any claim by Mr. Prager, despite some inaccuracies of detail which have nothing to do with the defamatory sting complained of. Of these, the most weighty one is the Missouri indictment, the presumed product of deliberation and vote of the Grand Jury there, a fact that carries with it the determination of probable cause inherent in it.

Besides that, having been filed with a court, its content is absolutely privileged.

The other two sets of civil charges do not carry the force of a probable cause determination, but there is nothing submitted on the motion to deny either the fact or content of any of the three sets of charges, none of which names Mr. Prager at all, or to address their own privilege as documents on file with a court of record.

■ The inaccuracies are of unimportant detail. The Grand Jury was referred to as a Federal Grand Jury, when in fact it was a Missouri Grand Jury. Under well-established principles of federalism, the States and the Federal Government are all sovereigns with the States having sole authority to prosecute for State offenses and the Federal Government for Federal offenses. To say that one was indicted by a Grand Jury is, therefore, equally defamatory, though not actionable when true, regardless of whether the body be State or Federal.

The other inaccuracy is a statement seeming to refer to IDC itself as a New Jersey company. The Missouri indictment does not charge the corporate entity. Its body contains a corporate name which does not appear to be the correct corporate name, does not say where it was formed and thereafter in its body refers to it only by the abbreviation, IDC.

The Minnesota complaint does name the California parent by its corporate title and its Minnesota subsidiary and states where they were formed.

The FTC complaint names only the parent corporation by its full corporate name but does not identify it by State in the caption.

Another exhibit submitted by defendants is a certificate of the New Jersey Secretary of State that the New Jersey subsidiary having the name "International Diamond Corporation New Jersey Regional Headquarters, Inc.," was incorporated here.

Beyond that, the letter of December 11, 1981, a week after the Missouri indictment, sent by Prager's assistant and with his knowledge and approval to "Bob Blanchard, Eyewitness News-Dear Bob", carries the IDC name, Mr. Prager's name as District Manager, and his Livingston address as that of the "New Jersey District Offices."

Thus, while the reference to a New Jersey company is incorrect so far as the Missouri, Minnesota and California charges are concerned, it is of no significance here because there was a local operating unit, however structured internally, using only the segment "International Diamond Corporation, Inc.", of what is evidently a longer, and not the exact name of the various corporations in the structure, but, nonetheless, an abbreviation that could indicate any one or more or all of the parent and subsidiaries as though it were a trade name.

It should also be said that while there may not be any question that under the contracts between Mr. Prager and the International Diamond Corporation, Inc. he was nothing more than an independent contractor as an account executive or district

manager, nonetheless, the holding out to the public gave no such indication. The phone book listings which appear in the 1981 pages, White Pages and Yellow Pages, were of International Diamond Corporation. The letterhead was International Diamond Corporation, New Jersey District Offices, with Martin S. Prager as District Manager. The sales literature handed out was literature provided by the parent, the flyer announcing the seminar for November 12 was on Mr. Prager's International Diamond Corporation District Manager letterhead. And it is of some interest to note that at the bottom there's a reference to "Our national advertising in the Wall Street Journal and Barrons." These all carry the usual indications of a single enterprise conducted under a single name in the usual way through officers, agents or employees, even though its internal legal structure was no doubt different. The outer clothing was not the same as what was inside. This is not uncommon, particularly in the exploitation of franchises where a single prominent name is used by independent contractor franchisees. The arrangement enables both the franchisor and the franchisee to reap the benefits of a more prominent and publicly known name and good will. Thus, for the purposes of this kind of case it is not material that Mr. Prager was in fact an independent contractor acting in the capacity of an account executive, earning commissions on sales generated by him and as a district manager earning override commissions on his own sales and on sales generated by other account executives and channeled through his office for paperwork purposes.

So far as any literature is concerned, or letterheads, or business cards, or telephone book listings, or direct mail flyers, or ads in the Wall Street Journal and Barrons, or brief TV news accounts about IDC as a matter of consumer interest, there was held out to the public only one entity using the name International Diamond Corporation, Inc., although from everything presented on discovery this was not the exact corporate name of the parent or any subsidiary.

The fundamental test in any defamation case is what the meaning was that one receiving the communication is likely to have, in a reasonable sense, subjectively, even though mistakenly. This is the perception and this perception is the context within which the accused publication is judged.

A case in this District is that of Judge Whipple in *Cibenko v. Worth Publishers,* 510 F.Supp. 761 (N.J.1981) at page 764.

Because no one other than the persons actively involved in the operation of the marketing program, or their privies, had any means for awareness of the details of its legal structure, the actual facts of Mr. Prager's relationship to International Diamond Corporation are not significant here. It is the external perception by others that controls.

So far as prospects whom he dealt with were concerned, they would perceive him as the IDC representative through whom they would deal if they opened a diamond banking account.

So far as other sales representatives were concerned, he would be perceived as an IDC District Manager in the usual sense of the term.

So far as the prospects who received the announcement soliciting attendance at the November 12th seminar were concerned, the holding out is of International Diamond Corporation, Inc., on the letterhead, and of Mr. Prager as District Manager of the New Jersey District Office, particularly in view of the reference to the national advertising in the Wall Street Journal and Barrons.

Aside from the national advertising mentioned in the flyer at the seminar of November 12th, Mr. Prager testified there were seminars conducted about once a month in all 50 States by a group of 40 or 50 regional managers who worked out of California. These were scheduled for various dates and places of which he received announcements.

He describes one of them as attended by some 80 to 100 people, of whom five to ten were sales representatives and the rest

prospects. No orders were taken or sales made at these seminars.

The presentations, which were partly live and partly videotaped, were educational in nature going into what diamonds were, how they were mined, the control of the market supply by the DeBeers Company, the price history over the past 50 years, the value of the investment as a hedge against inflation and the like. This is how Mr. Prager described it.

Another exhibit marked during Mr. Prager's testimony, D–39, identifies a letter of November 13, 1981 on that same IDC letterhead with his name as District Manager to Frederick Schiffman, identified as a Regional Representative, reviewing efforts from July 1 to August 31, 1981, after which Mr. Prager's district office was opened. It reported various difficulties with the marketing program, such as the difficulty in retaining sales representatives, (55 had been recruited as of September 1 and only 15 were known to be active). There was poor attendance at seminars, he said, there was poor attendance at training sessions and generally poor sales volume.

He also mentions adverse publicity on diamonds and IDC in the New York Metropolitan area. And says he needs all the help he can get from the State, the zone, and the home office.

One of the solutions he suggests to the district problems is media advertising to explain who is IDC, what is diamond banking.

The newspaper ads to recruit sales representatives, of which there are examples from June 26 and October 9, 1981, speak of earning commissions of $50,000 and up. They speak of "unbelievable market support," including, among other things, national and local media advertising.

Contrary to Mr. Prager's testimony, both ads also say that, "Clients are sold at seminars."

He also testified about a videotape he and others in the company had received from IDC of programs on other broadcast stations throughout the country doing good will stories on investment grade diamonds. There were 15 to 20 segments from TV stations around the country.

This tape stimulated a discussion with his District Comptroller, Dennis Lee, about trying to get TV stations in this area to try to get them to do a similar story. Letters were sent to NBC, CBS and to Bob Blanchard, Eyewitness News, the last one opening with the sentence, "We thought your report on the 47th Street Diamond Trade was super!"

The letter to Bob Blanchard goes on to say: "Our office here in Livingston, New Jersey, was officially opened September 1. We have over 50 people actively representing us now, and we're just one of 500 district offices with over 11,000 representatives worldwide. Our key to success for clients who are diamond banking with us is education. Not only do we present clients with material that encourages fact-finding, but we present educational seminars, (no sales allowed), that enable clients to explore every possible avenue of concern.

"Drop by and visit us any time."

Mr. Prager testified that the CBS and NBC letters were much the same except for the reference to Bob Blanchard's program on the 47th Street diamond business which Prager describes as a program on consumer reporting and that it was nice. He says, however, that the real reason for writing was not the 47th Street program, but the videotape from IDC with the 15 to 20 good will stories on investment grade diamonds shown on various TV stations around the country. The letter was sent in to ask if they would like to do a story.

All of this establishes the substance that IDC itself and Mr. Prager as District Manager, were making use of various approaches to reach the public through the media, including the effort to get a consumer report story on the air without having to pay for advertising time.

Although the details of the methods and the pacing are different, IDC and Mr. Prager for his district, were doing the same kind of thing that Avins did for his law school,

and that Steaks Unlimited did for their four-day blitz sale of steaks.

Avins reached out to a body whose accreditation standards are accepted by many States as a basis for recognizing academic qualifications as a prerequisite to admission to the practice of law. He got a critical report but could not recover under the *New York Times* standard because he asked for it and made himself a limited purpose public figure in the context of that particular controversy.

Similarly, as Judge Adams observed in his opinion in 623 F.2d at page 273, Steaks Unlimited entered the Pittsburgh area and launched an intensive campaign "over local radio stations, through local newspapers, by large signs displayed at the sales locations and by handbills given to persons walking near Steaks Unlimited sales location at the various Zayre stores."

In doing so, it provided circumstances by its own conduct that were sufficient to support the District Court's conclusion that Steaks had voluntarily injected itself into a matter of public interest ... indeed, as Judge Adams said, it appears to have created the controversy. And it was injected into the matter for the purpose of influencing the consuming public. This conclusion was upheld on appeal.

In the present case, although the marketing was nationwide rather than local, and at a slower pace than a four-day special sale, all of the same elements were present. A variety of media were used for the purpose of influencing the consumer public— those having funds to set aside and wishing to do so in a way that would provide not only safety of principal but also a return adequate to overcome the erosion of inflation. Even high interest rates prevalent at the time were not enough, as the flyer for the November 12th seminar pointed out, because interest is taxable at ordinary income rates, and the net after tax could be below the rate of inflation, depending on the individual's top tax bracket.

Also, Mr. Prager's own documents to the district representative and the Atlantic Zone Chairman, John Herr, takes specific note of adverse publicity on diamonds and IDC in the New York Metropolitan area, and one of the solutions proposed by Mr. Prager was "media advertising" directed to the questions, "Who is IDC?" and "What is Diamond Banking?"

And Mr. Prager *acted* on his own recommendation, or suggestion, stimulated by the videotape of consumer interest programs, some 15 to 20 from various TV stations around the country, that had been sent to him, and also stimulated by Bob Blanchard's story on the 47th Street diamond trade.

The letter of December 11, 1981 does not openly ask for a free TV crew and TV time, but Mr. Prager's testimony is that this was his real purpose, while the soft sell content of the letter emphasizing education and educational seminars at which no sales are allowed would surely be so perceived by a knowledgeable commentator as the invitation, possibly a variation of Mae West's classic line, "Drop by and visit us any time."

Mr. Prager has testified that it was not his intention in extending the invitation to appear on TV himself. And this may well be true.

He testified that over a month before March 26th he had said he would set up an appointment with the principals of IDC who the Court infers would be one or more of the regional managers who conducted seminars and would be skilled in the art of public relations. He also says he asked Bob Blanchard not to broadcast the story on Friday, asking that he come back Monday when he would give whatever information he had.

Assuming this is so, which the Court must at this stage and for the purpose of these motions, it relates conversation not broadcast. The request not to air the story on Friday is not in the broadcast, it is in his testimony. The offer to grant an interview on Monday is in the broadcast, with a promise that he would "Give you all the information you *want*." (emphasis added).

This is a little different than what he said on deposition, namely that he would give

whatever information he "had." It is crucially different in meaning because, as Mr. Prager volunteered at the deposition, the information he had really was nothing, because he wasn't representing IDC's product any more.

There is another conflict too, between what he told Bob Blanchard and what he said on deposition in the same regard. On the broadcast of Monday, March 29th, a part of the tape made on Friday but not shown that night was used. It shows Mr. Prager saying, "We are only one outlet . . . of 700 . . ."

Bob Blanchard asks, "Are you, are you still?"

And Mr. Prager replies, "We're closing down, we're fading fast."

His testimony is that he had already stopped handling IDC, and the inference is inescapable that his offer on Friday of an interview on Monday was no more than a stall for time, not sincere. And, of course, as Monday's broadcast shows, there was no Monday interview.

Taking all these factors into account, there is no genuine dispute on any material fact that the Court can discern bearing on the question whether Mr. Prager had voluntarily made himself a limited purpose public figure in connection with the IDC marketing activity identified as diamond banking. He had a personal interest in its success since he received a commission on every sale he made and an override commission on sales others made as well as on his own or the others who had their paperwork channeled through his office.

The aggregate commissions for a district manager with the override seem to have worked out to 11 per cent, which means that for each $100 paid only $89 net would be available to IDC to pay for diamonds. And since IDC had to have some gross profit out of that $89, it means that some amount less than $89 would represent its own cost for buying the diamonds sold. If

their costs were, for example, $9, it would leave $80 to actually buy diamonds. And their value would need to increase by 25 per cent before they would be worth the hundred dollars that the customer had paid for them to make up the commissions.

Given these relationships and admitted figures, except for the assumed $9 in the last example, in comparison with the absence of any kind of commission charged for the acquisition of various forms of investment available from banks and savings and loan associations, for both short and intermediate terms, including IRA's, with guarantees from FDIC or FSLIC, there can be no doubt that the caption "RIPOFF" is a legitimate one, aside from which it is no more than an opinion, on which New Jersey does not allow recovery in this field, see *Kotlikoff v. The Community News,* 89 N.J. 62, 444 A.2d 1086 (1982).

This much having been decided, it follows that in order to prevail Mr. Prager must be able to prove with convincing clarity that the defendants broadcast false statements knowing of their falsity or with reckless disregard of the truth, that is, in the words of the *Gertz* Court, that the defendants acted "with a high degree of awareness of probable falsity." 418 U.S. at 332, 94 S.Ct. at 3003, citing the cases of *St. Amant, Beckley* and *Garrison.*[5]

In making its ruling, the Court applies the usual Rule 56 standard for summary judgment, rather than what seems to be in some courts a developing standard favoring summary judgment in defamation suits against media defendants acting under the guarantees of Free Speech and Free Press. See, for example, *Steaks Unlimited,* footnote 56, 623 F.2d at 275; and *Maressa v. N.J. Monthly,* 89 N.J. 176, at 196–197, 445 A.2d 376 (1982).

The court does not apply New Jersey's rule as announced by its highest court only last year because there is a Federal procedural rule on summary judgment, and the

---

5. *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Beckley Newspaper Corp. v. Hanks,* 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967); *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

rationale of *Erie Railroad Company*[6] as well as *Hanna v. Plumer*[7] dictate caution in this regard.

The material Mr. Prager has submitted as matters of fact, in an attempt to show there is a genuine issue on the question whether defendants can meet the requirements of standards set by the *New York Times* and later cases, including those of the New Jersey Supreme Court, falls far short of the mark. The reason for this is not that there is a special rule or presumption in favor of summary judgment disposition in cases of this kind, as suggested by the references just cited, but that there is a higher burden of persuasion to overcome the requirements established by *New York Times* and applicable through *Gertz* to a limited purpose public figure.

So by the application of the usual Rule 56 standard, if what is set out in Mr. Prager's answering affidavits were taken as true, they would not be enough to make a showing with convincing clarity that the broadcast was made, as to him, with actual subjective knowledge of falsity or with a high degree of awareness of probable falsity.

Mr. Prager also faces the statutory privilege of New Jersey's Shield Law, NJSA 2A:84A–21 as amended and supplemented. New Jersey has decided that its Shield Law is both comprehensive and absolute and extends to cover the editorial process. See *Maressa v. N.J. Monthly,* 89 N.J. 176, at 184–190, 445 A.2d 376 (1982).

On its face, the New Jersey Shield Law is far more comprehensive and absolute than the Pennsylvania Shield Law, as construed, and that law was regarded by the Court of Appeals in the *Steaks Unlimited* case as sufficient to show that Steaks could not meet its heavy burden of persuasion. And for that reason as well as there is no triable issue of fact in this regard.[8]

It must be kept in mind that the Constitutional guarantees of free speech and free press are not restricted in their application to media publications of such high quality as to earn a Pulitzer Prize. The Columbia School of Journalism founded by Joseph Pulitzer, including the modern application of journalism to the video TV medium with the valuable assistance of Professor Fred Friendly, is not the sole measure of the guarantee.

There is too wide a variety in size, scope, training and financial means to warrant such a restriction. It was concern for financial risks that led the *Gertz* Court to say that the balancing of interests called for rules that will avoid excessive self-censorship, or that might dissuade a timorous press from the effective exercise of First Amendment freedoms.[9]

---

**6.** *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

**7.** *Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).

**8.** Colloquy at oral argument verified what the record shows, namely that neither Bob Blanchard nor Ernest Anatos had made any affidavit or certification of fact among the papers relied on in support of defendants' motion, and that they intended to raise the N.J. Shield Law to the extent of its fullest scope if there were any attempt at discovery of them, and at trial.

**9.** Details of the inventory/warehouse swindle of F. Donald Coster and his siblings (members of the Musica family) are noted in the N.Y. Times Index starting in about December, 1938 and continuing well into 1941 under the name "McKesson & Robbins". The only reported cases found that arose out of that matter are *U.S. v. McGloon,* 116 F.2d 285 (CA–2, 1940), in which the entire per curiam opinion is, "Judg-

ment affirmed."; *McGloon v. U.S.A.,* 312 U.S. 702, 61 S.Ct. 808, 85 L.Ed. 1135 (1941), in which the entire notation is, "Denied. Justices Douglas and Murphy did not participate"; and *Hermann v. McKesson & Robbins, Inc.,* 127 F.2d 450 (CA–2, 1942), which contains only a brief, passing reference to Mr. Coster.

There is respectable precedent for looking to the publications of the press for context information. See, for example, *Perez v. United States,* 402 U.S. 146, at 149, 91 S.Ct. 1357, at 1359, 28 L.Ed.2d 686 (1971), where Justice Douglas referred to and quoted from an article published January 28, 1968 in the New York Times Magazine as showing the link between loan sharking and organized crime in support of the exercise of the Congressional power over interstate commerce for sustaining the validity of the Consumer Credit Protection Act, 18 U.S.C. § 891 et seq.

The conviction of Anthony De Angelis on federal charges arising out of his warehouse receipts swindle based on false inventories of vegetable

Justice Pashman had this fact in mind in his discussion of New Jersey's Shield Law in *Maressa*. Justice Clifford made the same observation expressly in the *Kotlikoff* case, where he said: "The threat of prolonged and expensive litigation has a real potential for chilling journalistic criticism and comment on public figures and public affairs. Furthermore, the prospect of delay attendant upon *any* defamation trial, no matter how expeditiously handled, may inhibit the full and free exercise of constitutionally-protected activities." 89 N.J. at page 67, 444 A.2d 1086.

There are differences, too, in the way a matter develops to warrant public attention and how much is known at a given time. One instance is found in the recent opinion of the Supreme Court arising out of the Equity Funding swindle, the case involving Raymond Dirks.

Although that case is a case involving violation charges of the 1934 Securities Exchange Act and not a libel case, there is a passage of interest in the opinion.

After receiving some disturbing information about the company from a former officer, Mr. Dirks investigated the allegations and presented what he had gathered to the Los Angeles Bureau Chief of the Wall Street Journal, urging him to write a story on the fraud allegations. As Mr. Justice Powell tells it, "Blundell did not believe, however, that such a massive fraud could go undetected and declined to write the story. *He feared that publishing such damaging hearsay might be libelous.*" Emphasis added.[10]

This example illustrates very well what was meant by the Court when it said in the *St. Amant* case, that "To insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." 390 U.S. at 732, 88 S.Ct. at 1326.

Finally, the Court observes that quite aside from what has been said, the two broadcasts taken together and as a whole, and taken in the light a reasonable viewer would subjectively understand their meaning to be, either correctly or mistakenly, they are not capable of a defamatory meaning of, and concerning Mr. Prager. In making the evaluation, there necessarily must be excluded the various statements which Mr. Prager made on the broadcast, because those are his own publications and defendants cannot be held responsible for what he himself said.

oil is briefly recorded in *U.S. v. DeAngelis,* 361 F.2d 788 (CA–3, 1966), a brief per curiam involving solely the question whether the sentence imposed was for 10 years or 20 years (it was twenty). There is no detail about the swindle operation, obviously because defendant is noted as having pleaded guilty to 3 counts of a 19-count indictment, and one count of an information charging conspiracy under 18 U.S.C. § 2314.

The most recent of the large, false inventory/asset swindles is the one involving O.P.M. Leasing Services, Inc. Aside from reports in the public press, there is a highly detailed and exceptionally well-written Report of the Trustee describing the anatomy of this swindle in full. It is on file in the U.S. Bankruptcy Court for the Southern District of New York, Reorganization No. 81–B–10533 (BRL), dated April 25, 1983.

**10.** The fraud conducted at Equity Funding Corporation of America, Inc. (EFCA) is recorded in a number of reported cases, of which three provide the best review, and also list the vari-

ous books and many articles published about it. One of these arose out of the Chap. X reorganization, *Matter of Equity Funding Corp. of America,* 416 F.Supp. 132 (D-Cal., 1975). The other two involved the multi-district securities litigation, *In re Equity Funding Corporation of America Securities Litigation,* 438 F.Supp. 1303 (D-Cal., 1977), and on another aspect, 603 F.2d 1353 (CA–9, 1979).

Another book, not listed in the footnotes to the cases cited, is Donn B. Parker's "Crime By Computer" (Chas. Scribner, 1976), pp. 118 et seq.

The most recent reference is by the Supreme Court in *Dirks v. SEC,* —— U.S. ——, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983). Early in the opinion, Justice Powell describes how Dirks learned of the alleged fraud, interviewed officers and employees of EFCA and secured some corroboration of the fraud. He then urged the Los Angeles bureau chief to write a story on the fraud, but the latter declined as he did not believe such a massive fraud could go undetected, and "feared that publishing such damaging hearsay might be libelous."

As noted at the outset, the bulk of both broadcasts had to do with the IDC marketing program, the method by which the IDC offered "diamond banking", and then reported the Missouri indictment of specific named officers, the Minnesota fraud suit by its Attorney General, and the Federal Trade Commission's staff description in connection with its own suit in Federal Court in California.

Mr. Prager enters the picture, to coin a phrase, because of his assistant's inviting letter of December 11, 1981 ending with "drop by and visit us any time." What was broadcast was Bob Blanchard merely asking, "Do you know anything about the indictments?" and so on.

Prager said, "No." Whereupon Bob Blanchard said, "Well, I have, I got the Grand Jury indictment right here," and offers the papers to Prager.

Prager asks to be excused, and later offers an interview on Monday, to which Bob Blanchard says, "Okay."

The Monday broadcast is largely a rehash since there was no interview, adding a few bits already mentioned from Friday that were not used that night, with Prager saying he was only one outlet of 700. And when Bob Blanchard merely asks, "Are you, are you still?" he said, "We are closing down, we are fading fast."

Blanchard also adds the corrections requested by Mr. Prager's lawyer, namely that he's not an officer of the company; that he runs a clean operation; and that no one has ever lost any money.

For each and all of the foregoing reasons the defendant's motion for summary judgment will be granted and plaintiff's motion for partial summary judgment will be denied. Since all of the various other counts are derivative from or contingent upon the outcome of the defamation counts, they necessarily follow the same disposition.

Finally, it should be said on the record that nothing in this opinion, or during this hearing, or in the papers before the Court, amounts to any finding, evidence, determination or conclusion directly or by implication that Mr. Prager personally had any knowledge or awareness or participation in any of the wrongful acts or conduct charged in any jurisdiction in respect to International Diamond Corporation and the various officers named therein.